[No. 8738.]

VAN KLEECK v. RAMER, SECRETARY OF STATE.

CONSTITUTIONAL LAW—*Referendum.* A declaration by the General Assembly that an enactment is "necessary for the immediate preservation of the public peace, health and safety," is conclusive, and not subject to review by the courts. (10-14.)

SCOTT, J., dissented.

*Error to Denver District Court.* Hon. CHARLES C. BUTLER, Judge.

Mr. WILLIAM W. GRANT, JR., and Mr. WILLIAM E. HUTTON, for plaintiff in error.

Hon. FRED FARRAR, Attorney General, and Mr. CLARENCE M. HAWKINS, Assistant, for defendant in error.

In 1910, section 1 of article V of the Constitution of the State was amended so as to read as follows:

"Section 1. The legislative power of the State shall be vested in the General Assembly consisting of a Senate and House of Representatives, both to be elected by the people, but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independent of the General Assembly, and also reserve power at their own option to approve or reject at the polls any act, item, section or part of any act of the General Assembly.

The first power hereby reserved by the people is the initiative, and at least eight per cent of the legal voters shall be required to propose any measure by pe-

tition, and every such petition shall include the full text of the measure so proposed.     *     *     *

The second power hereby reserved is the refer- endum, and it may be ordered, except as to laws nec- essary for the immediate preservation of the public peace, health or safety, and appropriations for the sup- port and maintenance of the department of state and state institutions, against any act, section or part of any act of the General Assembly, either by a petition signed by five per cent of the legal voters or by the General As- sembly. Referendum petitions shall be addressed to and filed with the Secretary of State not more than ninety days after the final adjournment of the session of the General Assembly, that passed the bill on which the ref- erendum is demanded.     *     *     *'' Session Laws, 1910, 11, et seq.

At the twentieth session of the General Assembly an act concerning civil service, known as House Bill 173, was passed and approved, to which was appended, ''The General Assembly hereby declares this law is necessary for the immediate preservation of the public peace, health and safety.'' Session Laws 1915, 143. Within ninety days after the Twentieth General Assembly ad- journed, a petition having for its object the reference of the foregoing act, and containing the necessary num- ber of signatures, and sufficient in law in all respects, was tendered to the Secretary of State for filing, which he refused to accept. Thereupon plaintiff in error, as petitioner, instituted an action in mandamus against that official, the purpose of which was to compel him to receive and file the petition. The alternative writ set out the matters above narrated, and also averred that the act in question was not necessary for the immediate preservation of the public peace, health or safety, nor necessary for the preservation of the finance of the state, or the public service, or the efficiency of the departments

of the state, or the welfare and maintenance of the public institutions of the state, and that no necessity existed, or is likely to exist in the future why the General Assembly should declare the act was necessary for the immediate preservation of the public peace, health and safety. To this writ the respondent demurred, upon the ground that the court was without jurisdiction to hear or determine, or entertain the alternative writ, for the reason that the matters complained of therein are not within the province of the judicial department of the government to determine, but are wholly legislative, and that the writ did not state facts sufficient to warrant the relief sought by petitioner, nor state facts sufficient to constitute a cause of action as against the respondent, because the act, which it is sought to refer, declares that it is necessary for the "immediate preservation of the public peace, health or safety." The demurrer was sustained, and the action dismissed. Petitioner brings the cause here for review on error.

CHIEF JUSTICE GABBERT delivered the opinion of the court:

The ultimate question is whether the declaration by the general assembly that the act is necessary for the immediate preservation of the public peace, health or safety, is conclusive that it is a statute which excepts it from the referendum. *In re Senate Resolution,* 54 Colo. 262, 130 Pac. 333, in response to questions propounded by the senate, we said with respect to the constitutional provision, which recites that the power reserved, designated the referendum, "may be ordered except as to laws necessary for the immediate preservation of the public peace, health or safety;" that, "Whether a law is of this character, is for the general assembly to determine, and when it so determines, by a declaration to that effect in the body of a proposed act, we are of the opinion that such declaration is conclusive upon all departments of

government, and all parties, in so far as it abridges the right to invoke the referendum." It is now urged that this question was not involved, not raised by the questions propounded, nor argued in the briefs and not germane to the particular points under consideration. When the situation which confronted the senate is understood, as appears from the statement preceding the opinion, it is clear that the question we determined, which is now urged is dictum, was involved.

At the fifteenth session of the general assembly, in obedience to a constitutional amendment adopted at the general election of 1902, an act was passed providing for an eight-hour day for persons employed in mines underground, and in specified ore reduction works. Laws 1905, 284. At the eighteenth session of the general assembly an act was passed, Laws 1911, 454, of a similar nature, which in express terms repealed the act passed in 1905. The act of 1911 was approved June 2, of that year. It did not contain any declaration to the effect that it was necessary for the immediate preservation of the public peace, health or safety. August 3, 1911, and within ninety days after the eighteenth general assembly adjourned for the session, there was filed with the Secretary of State, a petition purporting to be signed by the requisite number of legal voters, asking that the 1911 act be referred to the people for approval or rejection at the ensuing general election. On July 2, 1912, there was filed with the Secretary of State a petition purporting to be signed by the necessary *per centum* of the legal voters of the state, requesting that there be submitted at the next general election, for adoption or rejection, a proposed eight hour law, which in some respects, at least, was in conflict with the act of 1911. This initiated law purported to expressly repeal the acts of 1905 and 1911. Both measures were published by the Secretary of State, and, at the general election in November, 1912, were adopted.

When the questions were submitted by the senate the general assembly had under consideration a proposed eight hour law, the purpose of which was to take the place of the referred and initiated acts. It thus appears, as stated in the opinion, that the senate was confronted with an anomalous situation, because two acts were upon the statute books, covering the same subject, in conflict with each other; one purporting to repeal the other, and that from the questions propounded, though not directly expressed, it was the desire of the senate to pass an eight hour act which could not be suspended under the referendum, provided it had authority to do so in such manner as would prevent the situation then presented from being repeated in the future. It was, therefore, apparent that in order to enable the general assembly to pass an eight hour law relating to the employment of men engaged in working in mines which could be made effective and not suspended in its operation by invoking the referendum, it was necessary to advise the senate in response to its questions, how this desirable result could be accomplished, and hence, the contention that what was said with respect to the power of the general assembly to declare that a law was necessary for the immediate preservation of the public peace, health or safety, and that such declaration was conclusive upon all departments of government, in so far as it abridged the right to invoke the referendum, was not dictum, but was directly involved and germane to the questions propounded by the senate.

Since answering these questions, the general assembly has been guided in passing laws by what was there stated. Our opinion was given in obedience to the Constitution, which requires the Supreme Court to give its opinion upon important questions, upon solemn occasions, when required by the Senate or House of Representatives. Certainty of the law is always desirable, and

when a decision is rendered, it should not be changed unless it is clearly wrong.

Counsel for petitioner now contend that the declaration in 54th Colorado, whether a law is of the character which excepts it from the referendum, is for the legislature to determine, is wrong. Their premise is that it is a judicial function to scrutinize an act, the general assembly has declared "necessary for the immediate preservation of the public peace, health or safety," and determine whether it is of that character, and whether a law is exempt from the referendum depends not upon the declaration of the general assembly, but whether such declaration is true as a matter of fact. The vital question, therefore, presented for our consideration is, what tribunal is vested with authority to determine whether a law is of the character which excepts it from the referendum. In other words, does this authority rest with the general assembly, or with the judicial department. This inquiry is much simplified by bearing in mind that the exception in the constitutional amendment, with respect to the referendum, is not confined to such laws as the general assembly may legally enact under the police powers of the state. The language of the amendment is broader and includes all laws necessary for the immediate preservation of the public peace, health or safety. Their exception from the operation of the referendum does not depend alone upon their character, but upon the necessity for their enactment, and being put in force in order to accomplish the purposes specified. Except as limited by the Federal or State Constitutions, the authority of the General Assembly is plenary. This has so often been declared that citation of authority to support it is unnecessary. The judicial department, however, cannot exercise any authority or power except that granted by the Constitution. *Field v. People,* 2 Scam. (Ill.) 79. By the constitutional provision under consideration, it is

provided that the power of the referendum "may be ordered except as to laws necessary for the immediate preservation of the public peace, health or safety." The object of this was to prevent the delay incident to laws enacted for such purposes not taking effect until ninety days after the final adjournment of the general assembly passing them, or their suspension until the next general election by invoking the referendum. This was necessary for the protection of the people of the state, as the suspension of such laws, even for a brief period might be disastrous and wisely the people did not reserve the power to approve or disapprove such laws, so that as to them the authority of the general assembly, which it may exercise under the Constitution, is not affected:

By article III of our Constitution it is provided:

"The powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution *expressly* directed or permitted."

During the process of the enactment of a law the legislature is required to pass upon all questions of necessity and expediency connected therewith. The existence of such necessity is a question of fact, which the general assembly in the exercise of its legislative functions must determine; and under the constitutional provision, above quoted, that fact cannot be reviewed, called in question, nor be determined by the courts. It is a question of which the legislature alone is the judge, and when it determines the fact to exist, its action is final. The courts cannot be advised what facts the general assembly acted upon when it determined that a statute was necessary for the purposes specified, and to undertake to review its action upon a question of fact, would be a

collateral attack upon its judgment. The general assembly has full power to pass laws for the purposes with respect to which the referendum cannot be ordered, and when it decides by declaring in the body of an act that it is necessary for the immediate preservation of the public peace, health or safety, it exercises a constitutional power exclusively vested in it, and hence, such declaration is conclusive upon the courts in so far as it abridges the right to invoke the referendum. *Kadderly v. Portland,* 44 Ore. 118, 74 Pac. 710; *Oklahoma City v. Shields,* 22 Okl. 265, 100 Pac. 559; *State v. Moore,* 76 Ark. 197, 88 S. W. 881, 70 L. R. A. 671; *State v. Levan,* 14 S. D. 394, 85 N. W. 605. To conclude the contrary would violate the constitutional provision to which we have referred, the plain object of which is to inhibit one department of government exercising any power that by the Constitution is vested in another. The Constitution defines the powers and duties of each department, and should the courts venture to substitute their judgment for that of the legislature in any case where the Constitution has vested the legislature with power over the subject, they would enter upon a field where it is impossible to set limits to their authority, and where their discretion alone would measure the extent of their interference. Cooley's Constitutional Limitations, 7th ed. 236.

The argument of counsel for petitioner that the courts are vested with authority to determine whether an act is of the character which excepts it from the referendum, notwithstanding the declarations by the general assembly that it is, is based upon the assumption that unless the courts exercise the power to determine that question, the people can be deprived of the right to refer a law, if the legislature, either intentionally or through mistake, declares falsely or erroneously that a law is necessary for the immediate preservation of the public peace, health or safety. The answer to this proposition is, that

under the Constitution the general assembly is vested
with exclusive power to determine that question, and its
decision can no more be questioned or reviewed than the
decisions of this court in a case over which it has juris-
diction. It will not be presumed that the general assem-
bly will disregard its duty or fail to observe the mandates
of the Constitution, or not act honestly. Neither can it
be assumed that the courts are better able to determine
whether a law is immediately necessary for the preserva-
tion of the public peace, health or safety, than the legis-
lature. Power may be abused, but that is not a valid
reason for one co-ordinate branch of the government to
assign for limiting the power and authority of another
department. The judicial department is as much bound
by constitutional provisions as any other. "It cannot
run a race of opinions upon points of right reason and
expediency with the law-making power." The courts
do not make constitutions or change them. They can only
construe the provisions of that instrument. So that the
only power we can exercise in solving the question pre-
sented, is to ascertain where the authority to determine,
when a law is exempt from the referendum, is lodged.
The cases cited by counsel for petitioner from Washing-
ton and California, holding that the question of whether
a law is necessary for the purposes specified is subject
to review by the courts, appear to be grounded upon the
assumption that the constitutional provisions, with re-
spect to the initiative and referendum, should be con-
strued so as to make effective the power of the referen-
dum. *State v. Meath,* 84 Wash. 302, 147 Pac. 11; *Mc-
Clure v. Nye,* 22 Cal. App. 248, 133 Pac. 1145. In the
Washington case, and also in a Michigan case, cited by
counsel, (*Attorney General v. Lindsay,* 178 Mich. 524,
145 N. W. 98), it is held that the authority of the legis-
lature to make the declaration that an act is necessary
for the immediate preservation of the public peace, health

or safety, is confined to such laws as the legislature may legally enact under the police power of the state. Neither of these reasons furnish the test by which to ascertain whether the courts have authority to determine if a law is of the character which exempts it from the referendum, or inquire whether the declaration of the legislature that it is, is false or erroneous.

The only test is, what department of government is authorized, under the Constitution, to determine whether an act is necessary for the purposes specified. This authority, as we have pointed out, is vested in the general assembly, and if that body erroneously or wrongfully exercises that authority, the remedy is with the people. It is not subject to review by the courts or any other authority, except the people. Under the reserved power of the initiative and referendum, after the declaration by the General Assembly that a law is necessary for the immediate preservation of the public peace, health or safety, when not referred to the people for their judgment, it still remains with them if they are dissatisfied with it, to cause a measure to be submitted at the next general election for its repeal. If, from experience, it appears necessary to deprive the general assembly of the power to declare a law necessary for purposes specified, the people have the power to initiate an amendment to the Constitution which will take from the general assembly the authority which they have vested in it. But this cannot be accomplished by the courts usurping a power they do not possess.

The decision *In re Senate Resolution,* was rendered at the January Term, 1913. In that opinion it was said that the declaration by the General Assembly that a measure was necessary for the immediate preservation of the public peace, health or safety, prevented it from being referred by invoking the referendum. The people, if dissatisfied with the power they have conferred upon

the legislature to thus abridge the right of the referendum, could have submitted an amendment to the Constitution at the general election of 1914, to deprive the General Assembly of this power. They did not do so, and while their failure to submit such an amendment is not conclusive, it is, at least, persuasive that they do not wish to take from the general assembly that authority.

The judgment of the District Court is affirmed.

*Judgment affirmed.*

. Decision *en banc.*

·Mr. JUSTICE HILL and Mr. JUSTICE WHITE specially· concurring.

Mr. JUSTICE SCOTT and Mr. JUSTICE TELLER dissent.

Mr. JUSTICE HILL specially concurring:

The act which the plaintiff in error seeks to have referred pertains to civil service, and contains many changes on that question. It makes all three members of the Civil Service Commission hold for two years, coterminously with the Governor by whom appointed. The term of each under previous law was six years, one to be appointed by each incoming Governor. It provides a salary of $50 per month for each commissioner, who, under the former law, served· without pay. It changes the classified service, and removes from the operation of the merit system many positions heretofore included. The Commission is given power to suspend the law whenᵣ ever a position to be filled involves qualifications of a scientific, managerial, professional or educational character. It provides for the certification of the three highest persons on the appropriate eligible list, as opposed to the highest person under former laws. It modifies and lessens the number of things prohibited by the law of 1913 concerning political contributions extorted from persons within the classified service, and offenses of a

similar nature. It lessens the amount to be recovered
from any official making payment without certification,
making such penalty four times less than provided by the
Act of 1913. It makes void all eligible lists created under
former laws, but makes no provision for the return of the
fee collected by the state for the privilege of taking the
examination and being placed upon the eligible list. It
repeals all former civil service acts passed by the legis-
lature, and also the one enacted by the people, which be-
came effective January 22, 1913. It contains a declara-
tion that it is necessary for the immediate preservation
of the public peace, health and safety, etc.

Were the questions proper for this court to deter-
mine, I would agree with the plaintiff in error that the
obvious effect of this act is to vacate many positions, and
leave them open for appointment by officials now in of-
fice, under the supervision and regulation of the new
board appointed, or to be appointed under this act. Also,
in making void the eligible list created under the 1913
law, and in making no provisions to return the fee col-
lected by the state for the privilege of taking the exam-
ination, it, in my opinion, is setting an example of bad
faith by the state before the many worthy young men
and women who paid this fee, and took the examination,
in the belief that it meant something, but only to have
their hopes and ambitions, in this respect, blasted by the
enactment of the law under consideration. In my opin-
ion, it also establishes a regrettable precedent for suc-
ceeding administrations when they wish to get rid of a
part, if not all, of the incumbents of these minor posi-
tions, and all those upon any eligible list then in exis-
tence, to simply re-enact a law similar to this and start
civil service, so-called, over again by repealing all for-
mer laws upon the subject.

Were it for this court to determine, I would also
agree with the plaintiff in error, not only that this act

was not necessary for the immediate preservation of the public peace, health and safety, but also that it is unnecessary at all, and that the people would reject it, were the question submitted to them. I venture this last prediction for the reason that this act repeals the one enacted by the people, which went into effect January 22, 1913, and had they not desired the one which they enacted, or wished it repealed and their wishes expressed therein annulled by the next legislature, I anticipate that they would not have enacted it in the first instance.

Regardless of these preliminary matters, there is an important question involved which, under our Constitution, as well as upon sound principles, must apply alike to all legislative enactments; that is, when a law is passed by the legislature whether it is necessary for the immediate preservation of the public peace, health and safety in order to have it go into effect at once, is for the legislature to determine, or must it remain uncertain, and be left in doubt, to be determined by everyone affected, in cases where it is sought to be referred, or during the period it can be referred, until passed upon by the courts? When our former system is taken into consideration, including the effect given to our emergency clause, when considered in connection with the amendment under consideration, in my opinion, there can be but one answer and that is that it was intended to be left to the legislature to determine; otherwise there would have been a declaration in this amendment to the contrary, or something to indicate that a different method was intended than had heretofore applied to our emergency clause. This position is strengthened by the fact that in our amendment adopted in 1910 we copied the language of the Oregon amendment upon this question, which had been ratified by the electors of that state in 1902. The Oregon amendment appears to have been taken from South Dakota, which adopted its initiative

and referendum amendment in November, 1898. Upon
April 3, 1901, the Supreme Court of South Dakota, in
*State ex rel. Lavin et al. v. Bacon et al.,* 14 S. D. 394, 85
N. W. 605, held that the declaration of their legislature
upon this subject was binding upon the courts. In De-
cember, 1903, the Supreme Court of Oregon, in placing
a construction upon their amendment in *Kadderly v.
Portland,* 44 Oregon 118, 74 Pac. 710, 75 Pac. 222, held
that it is distinctly for the legislature to determine, and
its actions in the matter are not reviewable by the courts.
In January, 1907, the question was again before that
court in *Sears v. Multnomah Co.,* 49 Oregon 42, 88 Pac.
522, wherein the same principles were recognized and
adhered to. The Oklahoma reference clause, etc., is quite
similar to that of South Dakota and Oregon; it was rati-
fied by the people in 1907. Upon September 16, 1908, in
*Oklahoma City v. Shields,* 22 Okla. 265, 100 Pac. 559, the
the Supreme Court of that state followed the ruling in
South Dakota and Oregon, by holding that the question
of necessity, etc., was for the legislature to determine,
and not subject to review by the courts. This was all be-
fore our amendment was submitted. It is elementary,
as a general rule with but few exceptions, that when a
state adopts the constitutional provisions of a sister state,
it also adopts the construction given to such provisions
by the decisions of the courts of the state from which
they are taken.—*Lace v. The People,* 43 Colo. 199, 95
Pac. 302. This rule being so well recognized and under-
stood in this state, if any other meaning was intended
than that given it by the South Dakota, Oregon and Ok-
lahoma courts, in my opinion, other language would have
been used so as to express such a different intent; this
not having been done, under this elementary rule of con-
struction, we are in duty bound to follow the construc-
tion given to this language by our sister states.

Whether the Legislature in passing this act, and the Governor in approving it, have abused their power by declaring and approving that it was necessary for the immediate preservation of the public peace, health and safety, (if such is not the case, as is urged), is not for this court to determine, and can have no bearing upon the question. They were elected by the people, and are accountable to the people, and if they desired—as they must have by the passage of this act—to place upon the statute books a law which accomplishes the result above outlined, including the repeal of the civil service law enacted by the people in 1912, they are answerable to the people for the result of their work, and not to this department of government. There must always be a diversity of opinion concerning questions of legislation. Whether a case is so notoriously wrong or ridiculous that it necessarily discloses bad faith upon behalf of the legislature, is not, under our Constitution in matters of this kind, for the courts to determine.

The fact that the courts decide whether a law is constitutional has no application to this question, that is purely a legal question to be decided from the language of the Constitution, and the act claimed to be in conflict with it. The necessity for a law is a matter of opinion; some think yea, others nay. Whether a law is necessary for the immediate preservation of the public peace, health and safety and for any of these reasons should take effect at once, involves questions of fact, which will likewise create a diversity of opinion. The members of the legislature are elected to determine these questions. They have committees that hold hearings and otherwise secure information which may not be accessible to this court. Its members may have reasons for passing many acts, and the necessity for their immediate enforcement, which the courts never hear of; yet according to the argument, without any of these reasons or facts before us,

it was intended to be left as a judicial question. I do not think so, and without an express declaration in the Constitution to the contrary, I think the reasoning in the South Dakota case, the Oregon cases, the Oklahoma case herein referred to, the minority opinions in the Washington cases, and the majority opinion in this case, are unanswerable upon this question.

While the Constitution of Washington is somewhat different from ours, and for that reason *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 Pac. 11, might be distinguished by a splitting of hairs, it is questionable, at least yet, whether this case has been accepted as a settled law of that state. It was rendered by a divided court of five to four, with vigorous dissenting opinions. In *State ex rel. Case v. Howell, Secretary of State,* 85 Wash. 281, 147 Pac. 1162, the question was again before that court, to compel the Secretary of State to recognize the rights of petitioners to have an act of the legislature referred. The writ was denied, a part of the judges adhering to the conclusion in the former case that it was a judicial question, but that the Secretary of State had determined it correctly, others declined to accept this first position as sound, but concurred in the conclusion for the reason that it was a legislative question and for this reason the court should decline to compel its reference when the legislature had decided otherwise.

Other reasons which lead me to believe that it was not intended to be left as an open question like the constitutionality of a law, is the consequences that might follow the application of such a system. Certainty as to what the law is and when it goes into effect, is always desirable. If, as is contended, the declaration of the legislature means nothing unless in fact true, which can be decided by the courts, then everyone interested must, before it is reached by the courts, decide for himself whether it is true or false, and concerning things upon

which there will always be a diversity of opinion. When the Legislature has declared it is necessary, etc., a small per cent of the people, viz., five per cent, would have the right, in the first instance, to challenge the correctness of its decision by signing a petition to refer; it would then be necessary for the Secretary of State to determine the question; if he did not agree with them, it could then be taken to the courts as in this case, but if he agreed with them, and no one took sufficient interest in it to attempt to have him enjoined, it would then go on the ballot at the next election, and in case the people rejected it, yet later on or during the interim some one sought to have it recognized and enforced as an existing law, and the courts held that 'the declaration of the legislature was true, and for this reason it was not a subject to be referred, I take it that it would be a valid law all the time, and all subsequent actions by the petitioners, the Secretary of State, the election officials and even the electors in voting to reject it, would be a nullity, for if it was not a subject to be referred and was a valid law when this was attempted, it would thus remain regardless of this method of procedure in attempting to get rid of it. In *Town of South Ottawa v. Perkins,* 94 U. S. at page 267, 24 L. Ed. 154 it is said:

"That which purports to be a law of a State is a law, or it is not a law, according as the truth of the fact may be, and not according to the shifting circumstances of parties. * * * And whether it be a law, or not a law, is a judicial question, to be settled and determined by the courts and judges."

This was quoted with approval in *Arkansas Tax Commission v. Moore,* 103 Ark. 48, wherein it was held that the question of necessity, etc., was for the legislature to determine. See also *Wilkes Co. v. Coler,* 180 U. S. 506, 45 L. Ed. 642, 21 Sup. Ct. 458, and *Rogers v. State,* 72 Ark. 565, 82 S. W. 169. The same uncertainty would

apply to every law of this nature during the entire ninety days following the adjournment of every session of the general assembly, and where questions of fact are involved, concerning which there may always be a difference of opinion. Other illustrations could be given, but these are sufficient to convince me that had the legislature and the people thus intended they would have said so in language which would not be susceptible of a different, and, as I view it, a more rational construction.

Mr. Justice White specially concurring:

I concur in the affirmance of the judgment of the trial court, but am unwilling to approve all the language of Chief Justice Gabbert in disposing of the matter.

The controversy involved is between two agencies of the legislative department of the government, in the exercise or attempted exercise of power, and were it not for certain reasons, which I shall presently state, I would be inclined to the view that a proper construction of the initiative and referendum provision of the Constitution did not invest the General Assembly with the power, for the purposes of legislation, to finally determine whether a legislative act was of the character that could not be referred to a vote of the people. On the contrary, I would, perhaps, hold with the Supreme Court of Washington,—*State ex rel. Meath,* 84 Wash. 302, 147 Pac. 11, —that the declarations of the general assembly in that regard are subject to review by the courts, and whenever a controversy arises between the two branches of the legislative department as to the correctness of declarations of that character the duty devolves upon the courts to determine the question. It is a matter of common knowledge that the initiative and referendum provision of our Constitution was taken from the constitution of the State of Oregon, and had, prior to its adoption here, been construed by the highest court of that state. *Kad-*

*derly v. Portland,* 44 Ore. 118, 74 Pac. 710, 75 Pac. 222. It is also apparent that Oregon had taken it from the constitution of South Dakota, where it was adopted in 1898, and had previously been construed in that state. *State ex rel. v. Bacon,* 14 S. D. 394, 85 N. W. 602. In each state the highest court had held that in the process of legislation it was exclusively within the power of the General Assembly to determine whether a proposed act was necessary for the immediate preservation of the public peace, health or safety; and if it determined that it was, the act was not subject to referendum, and the courts had no power to review the action of the general assembly in the premises. Subsequent to those decisions the initiative and referendum was written into the Constitution of this State. It would, therefore, seem that under the well established rule that when a state adopts the constitutional or legislative provisions of another state, it also adopts the prior construction given to such provisions by the decisions of the courts of the state from which they are taken, we should follow the aforesaid decisions of the courts of Oregon and South Dakota. *Bradbury v. Davis,* 5 Colo. 265; *Stebbins v. Anthony,* 5 Colo. 348; *In re Shapter's Estate,* 35 Colo. 578, 85 Pac. 688, 6 L. R. A. (N. S.) 517, 117 Am. St. 216; *Lace v. People,* 43 Colo. 199, 203, 95 Pac. 302; *Hallett v. Alexander,* 50 Colo. 37, 50, 114 Pac. 490, 34 L. R. A. (N. S.) 3281, Ann. Cas. 1912B, 1277.

It is true the rule is not inflexible—*Davis Iron Works Co. v. White,* 31 Colo. 82, 71 Pac. 384,—nevertheless, when the adopting state has, as here, through its highest court, placed the same construction upon the provisions that had been given them by the decisions of the court of the state from which they are taken, it would seem, in order to have reasonable stability in the fundamental law and certainty in government, we should accept the matter as finally settled. Such construction was given the consti-

tutional provision in question by this court in *In re Senate Resolution,* 54 Colo. 262, 130 Pac. 330. It may, perhaps, be true that the questions propounded in that case might have been answered without expressing an opinion upon the referendum clause of the Constitution, and that technically the matter was not involved in the questions propounded. However, in a unanimous decision this court expressly stated that the matter was included in the questions propounded and that it was necessary to determine the same. Clearly, under such circumstances, it is no more than mere assertion to say that the language of this court in determining that question was *obiter.* Furthermore, it must be presumed that the people of the state in adopting the constitutional provisions were cognizant of the construction the language had already received; and were conversant also with the rule which is applied in considering the constitutional or legislative provisions adopted from another state. So, if the people desired to have the courts determine the question as to whether or not a legislative measure was subject to reference, they could and should have embodied in the constitutional provision the express declaration that the courts should do so. This they did not do, and I am unable to persuade myself that we should disregard well established rules of construction, and our own decision, and ascribe a new meaning to this constitutional provision. Unless the course I have indicated herein is pursued, the judiciary, I fear, will soon become an arbitrary, governmental agency, and justice be administered, not according to the law with consistency, equality and justice, but according to the capricious and varying judgment of those who, for the time being, are entrusted with the duty of administrating it.

Scott, J., dissenting.

The principle of direct legislation is comparatively new in our government and does not now obtain in a majority of the states. For this reason, what is known as the initiative and referendum constitutional provision has been construed by but few of our courts, and, as applied to the particular question involved in this case, the courts that have determined it are about equally divided. Hence, there cannot be said to be a weight of authority, considered from the standpoint of numbers of jurisdictions, in favor of either of the different conclusions.

Therefore, the provision of the Constitution should be construed in the light of the intendment of the people who adopted it, and in view of the improvement in popular government proposed to be accomplished by it.

At the beginning of the agitation for this reform, there was a popular belief among the people that by the strictly representative plan of expressing the popular will, the people were too frequently misrepresented and often betrayed. Indeed, so intense was this feeling that there arose a common cry that representative government was a failure.

There was, without dispute much to justify this feeling. Senatorial elections by the legislature in many instances had become a national disgrace. Refusal to enact laws repeatedly demanded by the people through their party platforms and otherwise, instilled the belief that corruption was rife, and that legislators were subject to the influence of privileged interests.

The refusal of legislatures to submit constitutional amendments, popularly demanded, which in most cases required a two-thirds vote in each house of the assembly, added to the feeling of wrong and injustice.

Out of all this there grew a conviction that the electorate was too distantly removed from their government,

and that individual and direct control was imperative. The system of direct legislation was evolved. Ours is a people's government, in theory and in declaration, at least. In them alone rests the sovereign power.

The purpose was to withdraw from their representatives the absolute and unlimited power to write their laws, and to reserve to themselves the equal right to enact statutes and constitutional provisions, by initiation, and independently of the legislature. They designated this the first reserved power. Again, they withdrew from the legislature the sole power then possessed, to finally enact statutes, took from the Governor the sole power to veto or approve acts, and reserved to themselves the power to veto acts of the Legislature. This they designated the second reserved power, or the referendum. They realized that experience had demonstrated the imperative necessity of emergency legislation, and prudence dictated certain exceptions from the broad reserve of such power over all laws. Hence, they wrote into their constitutional provision, two exceptions.

The one excepted class of laws was, "appropriations for the support and maintenance of the department of state and state institutions." Not all appropriations by any means, but confined to appropriations for the support and maintenance of "the department of state," and "state institutions." This is a plain, unequivocal limitation and reservation of power to the people themselves as applied to every other kind of appropriations. The purpose is plain; that the machinery of government should not be interrupted, nor its educational, penal nor charitable institutions suffer by reason of the necessary delay caused by reference, nor in case of calamity by fire, epidemic or otherwise. If the conclusion of the majority as to the other exception is sound, then it must apply to the exception as to appropriations.

If the Legislature should make an appropriation to relieve suffering Belgians, then under the reasoning of the majority opinion, this court must declare that it was for the legislature to decide that it was an appropriation for the support of our department of state, or our state institutions, and having so decided, the constitutional reserved power cannot apply. That is to say, plain unmistakable constitutional limitations of power do not limit. Express reservations of power, in language concerning which there can be no doubtful meaning, do not reserve; that the people by their organic law can reserve no power, nor place a limit upon the legislative will; that the *ipse dixit* of the assembly is paramount to the Constitution; that it can if it pleases, declare that to be constitutional, which the Constitution prohibits in unmistakable terms. Such is the logic of the majority opinion.

The one other exception to the expressly reserved power in the people to veto all laws enacted by the legislature, is as to "laws necessary, for the immediate preservation of the public peace, health or safety." This reservation of power is twice stated in the amendment:

"The legislative power of the State shall be vested in the General Assembly consisting of a Senate and House of Representatives, both to be elected by the people, but the people reserve to themselves the power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls independent of the General Assembly, and also reserve power at their own option to approve or reject at the polls any act, item, section, or part of any act of the General Assembly."

"The second power hereby reserved is the Referendum and it may be ordered except as to laws necessary for the immediate preservation of the public peace, health or safety, and appropriations for the support and maintenance of the department of state and state institutions, against any act, section or part of any act of the

General Assembly, either by a petition signed by 5 per cent of the legal voters or by the General Assembly * * *, etc.''

If it be the conceded purpose of the people to so limit the power of the legislature, and there can be no other inference, what could have been the purpose in giving to the legislature in the same provision, at the same time, the supreme power to nullify such express reservation and limitation.

To so hold, is to declare this amendment to the Constitution, a mockery and a sham. Are we justified in holding such to have been the intendment of the people. Otherwise, how can we justify the construction the court is placing upon it.

The rule of construction which should be here applied, is well settled by this court:

''In construing a Constitution, all its provisions relating directly or indirectly to the same subject must be read together, and any amendment in conflict with prior provisions must control, as it is the latest expression of the people * * * the presumption is, that the people, in exercising their supreme power, did not do a vain act but effected a definite purpose. * * *

The amendment of the Constitution is an exercise of the sovereign power of the people of the State to give to their expressed will the force of a law supreme over every person and every thing in the State, so long as it does not conflict with the Constitution of the United States. The rule so established bears down and supplants all other laws, and rules that are inconsistent with it. In determining rights controlled by it, we therefore have only to ascertain what it means and give it full effect, so long as it encounters no opposition in the higher law of the Federal Constitution.'' *People v. Cassiday,* 50 Colo. 520.

It is not contended that the purpose of the people is expressed in obscure or uncertain language. The character of laws within the exception, is expressed in words of unequivocal and well understood meaning, "the public peace," "the public health," and "the public safety."

I think no sane person will insist that a civil service law can be "immediately necessary for the preservation of the public peace, health or safety," under any sort of meaning to be applied to such terms. So that it must stand admitted by the majority opinion that the declaration contained in the act, that it is necessary for the immediate preservation of the public peace, health and safety, does not reach even the dignity of a subterfuge, but is palpably false, and the sole question here is as to the power of the legislature, to so brazenly defy the constitutional limit upon their authority, and assume to exercise a power, which the people have in their organic law reserved to themselves.

The first court to pass upon that question was the Supreme Court of Oregon in the case of *Kadderly v. Portland,* 44 Ore. 118, 74 Pac. 710, 75 Pac. 222. The principal question in that case was whether or not the initiative and referendum amendment was in violation of art. 4, sec. 4, of the Federal Constitution, which guarantees a republican form of government, and upon which question the case went to the Supreme Court of the United States, which court sustained the Oregon court in the holding that the amendment was republican in form.

The question we are considering was not called to the attention of the United States Supreme Court, and not considered. It was no more than incidentally considered by the Oregon court, and not there fully nor fundamentally reasoned, in the light of the new principle in popular government.

The holding in that case has been blindly followed, and as hastily considered by those courts which have

adopted the conclusion, viz.: Arkansas, Oklahoma, and North Dakota, and now by the majority opinion in this case. No one of these courts, including the present case, has offered an additional reason but have complacently adopted the false premise there assumed.

I take it that the Oregon court was misled by previous judicial consideration of emergency legislative constitutional provisions, and the failure to distinguish as between these, and the language and principle involved in the initiative and referendum emergency provisions. For instance, our own constitutional provision in that regard was, art. V, sec. 19:

"No act of the General Assembly shall take effect until 90 days after its passage (except in case of emergency, which shall be expressed in the act) unless the General Assembly shall by a vote of two-thirds of all the members elected to each house otherwise direct."

It will be noticed that the Legislature was given the absolute power to thus declare an emergency, and in every kind and class of legislation. Besides, it was adopted before the people had reserved to themselves any legislative power whatsoever, and before they had elected to reserve a veto power, or to place a limit upon legislative action, judgment or discretion, other than as in general constitutional limitations. •

The fundamental error of the Oregon court in this respect is well stated in the case of *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 Pac. 11, as follows:

"The whole error in the reasoning of the respondents and the case upon which they rely is based upon the fundamental error that this inquiry involves a controversy of opinion between co-ordinate branches of the government. If the question could be so stated, we might follow them. It cannot be so stated. There is another factor not occurring under the old order, where we took account of the executive, the representative body (the

Legislature), and the courts. There is now a fourth element: the people reserving the right to assert its will over the legislative department of the government.

Where the principle of direct legislation has been adopted, the legislative power is primarily in the people, and the old rule that the legislative body has primary power must be qualified. It is primary, and at the same time it is a permissive power—a power subject to dictation and to control. *Stetson v. Seattle,* 74 Wash. 606, 134 Pac. 494.

*   *   *   Without further reviewing the cases, it is enough to say that none of them grasp the reason or philosophy of the recent change in the fundamental law. They are in step with a tune that is dead. It is no answer to say that courts have always held to a certain rule, for, as we have shown, the present condition has not existed heretofore. The first of the adjudged cases did not note the change or rather did not count it as a change at all, and the others have followed it blindly and with the usual reference for 'authority.' As Judge Dunbar said in *State ex rel. Oregon R., etc., Co. v. Railroad Co.,* 52 Wash. 17, 100 Pac. 179: 'Law is a progressive science.' If this be so, courts should not put themselves to the task of groping for 'authority' to sustain a statute or an amendment to the Constitution when it is clearly within the power of the Legislature to pass it or of the people to adopt it.''

The argument in the Oregon case is restated in the majority opinion and it is not necessary for me to more than comment on it.

The first proposition is that the exception expressed in the amendment, viz.: "public peace, health and safety" is a term broader in scope, and that therefore such exception is not confined to such laws as the legislative assembly may legally enact by virtue of the police powers of the state, or to those alone that may effect the

public peace or safety. But that the language of the constitutional amendment is broader, and includes all laws of whatsoever kind, necessary for the immediate preservation of the public peace, health or safety, whether they impose restraints on persons and property, or come strictly within the police powers or not.

Starting then, with this mistaken premise, an argument is builded, upon which the conclusion rests. It is then argued that the police power as generally understood, is limited to the imposition of restraints and burdens on persons and property, in order to secure the general comfort, health and prosperity of the state.

It is then insisted, that the rule that the legislative assembly is the sole authority to determine the wisdom or expediency of any such law, applies to the referendum amendment, and for such reason it is not within the power of the courts to decide whether or not a specific act may be necessary for that purpose.

In support of this contention the majority opinion quotes from art. III of our Constitution, which provides that the government of the state is divided into three distinct departments; legislative, executive and judicial, and that no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as the Constitution expressly directed or permitted. It is then argued that the existence of necessity is a question of fact, which the General Assembly in the exercise of its legislative functions must determine.

The constitutional provision thus referred to is without doubt a very wise one, and necessary to a preservation of the autonomy of our government.

The argument would be entirely sound if the general assembly still possessed the sole and exclusive legislative power. But it does not, and this is where the ma-

jority of this court and the authorities upon which they rely, fall into grevious error.

The initiative and referendum amendment has taken from the general assembly its absolute power to legislate, and has placed, certainly the equal, if not the paramount power to legislate, in the people themselves. In addition to this the amendment reserves the power to veto legislation by the assembly. When we now speak of legislative functions we must consider that the power to legislate is within the body of the people, as well as in the general assembly, and that the legislative power of the former is equal to, if not greater, than that of the latter.

Can it be said then that the assembly as a legislative authority is now possessed of the exclusive power to determine the question of fact as to expediency or necessity, and deny this power to the other and greater legislative body, the people themselves.

In so doing, does not this court fall into the error which the majority say we must avoid. That is to say, do we not thus place this judicial tribunal in the position of violating the constitutional provision suggested, by denying the legislative power belonging to the people on the one hand, or as equally violative of the initiative and referendum amendment, by declaring that the general assembly has the sole power to determine the fact of expediency or necessity, in the face of the organic law, which reserves to the people, at least a like power of legislation.

It will be thus seen that by the failure of the Oregon court, and of this court, to recognize the new, or rather reserve power of the people to act as a legislative body, their argument is left wholly without support, and falls of its own weight.

But this court has not always been so tenderly sen-

sitive concerning infringement upon the powers of the legislative department of the state government.

In the case of *In re Morgan,* 26 Colo. 415, 58 Pac. 1071, 47 L. R. A. 52, 77 Am. St. 269, in holding the eight hour law, for underground miners and smeltermen, to be in violation of the Constitution, it was said: "It is for the legislature to determine the exigency, that is, the occasion, for the exercise of the (police) power; but it is clearly within the jurisdiction of the courts to determine what are the subjects upon which the power is to be exercised, and the reasonableness of that exercise," citing authorities.

If that principle was sound then, why shall it be denied now?

The Oregon opinion makes the bald inconsiderate statement, unsupported by either reason or authority, and which in those jurisdictions following the theory of that case, has been adopted blindly and without question. This proposition is a patent absurdity and is as follows:

"But the language of the constitutional amendment is broader, and includes all laws, of whatsoever kind, necessary for the immediate preservation of the public peace, health, or safety, whether they impose restraints on persons and property, or come strictly within the police powers, or not. The laws excepted from the operation of the amendment do not depend alone upon their character, but upon the necessity for their enactment in order to accomplish certain purposes. As to such laws, the amendment of 1902 does not in any way abridge or restrict the power of the Legislature, which by the insertion of a proper emergency clause, may unquestionably cause them to go into effect upon approval by the Governor."

That is to say that the exception in the referendum amendment, not only includes all laws that may be supported upon the theory of exercise of the police power,

but includes all laws, definable or not in character, and therefore unlimited either by character or number; i. e., that the referendum in itself is a mere form, controlled absolutely by the will of the assembly, and that the exception is unlimited in scope, and therefore there is no right of referendum, which the assembly or the courts are bound to respect. It is unbelievable that the people can have intended to embody such mockery in their Constitution.

Can it be said that after all the long continued abuse of legislative power, the continued agitation and struggle to secure relief, the people undertook to reserve to themselves a power in that respect, which must be construed by the courts, as mere sounding brass and tinkling cymbal? Yet such is the logic of the Oregon declaration, and the approval thereof, by the majority here.

There is no basis for the conclusion that all acts finding support upon the theory of police power, is included within the exception, "immediately necessary for the preservation of the public peace, health and safety." Many laws are sustained upon the theory of the exercise of police power, that can in no sense be held to be immediately necessary for the preservation of the public peace, health or safety. Among these may be mentioned, acts for the regulation of public utilities, regulating the conduct of mines and mining, banking, insurance, workman's insurance compensation, factory inspection, widow's pensions, child labor laws, hours of labor, and many others of similar character.

Can it be believed for a moment that in enacting the initiative and referendum into organic law, the people intended to entrust all these to the arbitrary will of the general assembly, and to reserve no power to the people's assembly?

It is this very character of legislation that induced and secured the power of the initiative and referendum.

Experience and common sense dictates that the people meant just what they said, when in plain terms they limited the power of the assembly in its finality, to the enactment of laws, not subject to their power of review, to those laws alone that may arise in case of governmental emergency, immediate and necessary.

While such an exception may include only such acts as do find support within the exercise of the police power, yet it is rank absurdity to say it includes all acts that may find support within such power.

It is plain that the intendment of the referendum amendment was that expressed by the plain English in which it is written, a clear reservation of legislative power to the people on the one hand, and a limitation of the legislative power of their representative servants on the other.

The exception under discussion is not a question of emergency, but one of power. If the general assembly has the unlimited power to enact the statute, untrammeled by the reserved power of referendum, by reason of its being within one of the stated exceptions, then, that body may or may not declare an emergency as it may elect. If, however, the act is not within either of the exceptions, it is powerless to declare an emergency by any vote, by any declaration, or at all. For in such case the constitutional amendment controls, and no such act can become effective for a period of ninety days in any event, being the time fixed in which the referendum may be invoked.

The opinion in the case of *State v. Meath, supra,* is the first to enter upon a fundamental and reasoning consideration of the new direct power of the people in government, and the logic and the conclusion in that case seem to be unanswerable. Among other things it was there said:

"In the new enactment they have not only fixed the limit but have restricted it to the primary elements of the police power, the 'health, peace, and safety' of the state. It was done deliberately. The people said to the Legislature: Make such laws as you will, but you may not legislate so as to take away our right to pass upon the law you have just enacted, 'except such laws as may be necessary for the immediate preservation of the peace, health, or safety, support of the state government, and its existing institutions.' It is certain ground, for men will not usually differ in opinion where the immediate preservation of the peace, health, or safety of the state is at stake. To hold that the old rule of construction applies is to write this reservation out of the Constitution."
* * * Under the old form, the Legislature was acting under a free license to legislate. The people had reserved no right of review. Its act implied discretion, and courts had very properly held that one co-ordinate branch of the government will not review the discretion of another. There was no review or appeal from an expression of that discretion, however violently it wrenched the moorings of constitutional restraint. The declaration of an emergency was final and conclusive. But here no such declaration is final and should be given no immediate effect, unless it can be fairly said that the act is necessary to preserve the health, peace, or safety of the state or to support the government or its institutions. 'The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty— indeed, are under a solemn duty—to look at the substance of things whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If therefore, a statute, purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of

rights secured by fundamental law, it is the duty of the courts to so adjudge; and thereby give effect to the Constitution.' *Mulger v. Kansas,* 123 U. S. 623, 661, 8 Sup. Ct. 273, 297 (31 L. Ed. 205). The reservation in the amendment is a declaration of 'Thou shalt not,' except it be for the safety or support of the state."

In *Attorney General v. Lindsay,* 178 Mich. 524, 145 N. W. 98, there is likewise a very exhaustive discussion of the subject under consideration, supporting the principle for which I am contending. It was there said:

"Courts have never refused to review acts of the legislature in the exercise of a discretion, unless it explicitly appears that the grant of such discretion was exclusive, and the right to determine, in such a case, the question as to whether the exercise of such discretion by the Legislature has been a proper one is inherent in the court as the final arbiter of constitutional and statutory construction. This case is no other or different from any other case which involves constitutional construction, and it must be decided upon well-known principles of law and the application of the ordinary rules of such construction.

As already stated, this section, without dispute, was intended to be a restriction upon legislative action, and confined the legislative power and discretion to give immediate effect only to the classes of legislation designated. The logical conclusion of the contention of respondents (admitted by them upon the argument) that the Legislature may determine that any act passed by it may be given immediate effect, and that such determination is final, wipes out and makes of no effect the restriction intended by the people in adopting the new Constitution. No ambiguity appears in the wording of this section, and none is claimed by respondents. No words are used from which any implication arises that it was the intention to grant a specific delegation of power, the

exercise of which would be final. In constitutional construction the rule always obtains that the intent of the people is the intent to be ascertained and upheld. It is for the courts to determine this intent, as expressed in the Constitution, and to construe acts of the legislature with reference to it. The construction urged by respondents is not in harmony with the obvious intent of the people to restrict the power of the legislature in the matter of giving immediate effect to its acts, and therefore cannot be accepted.''

And again;

*In re Jacobs,* 98 N. Y. at page 110 (50 Am. Rep. 636), the court says:

''Generally it is for the legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety, and while its measures are calculated, intended, convenient, and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations, personal rights and private property cannot be arbitrarily invaded, and the determination of the legislature is not final or conclusive. If it passes an act ostensibly for the public health, and thereby destroys or takes away the property of a citizen, or interferes with his personal liberty, then it is for the courts to scrutinize the act and see whether it really relates to and is convenient and appropriate to promote the public health. It matters not that the legislature may in the title to the act, or in its body, declare that it is intended for the improvement of the public health. Such a declaration does not conclude the courts, and they must yet determine the fact declared and enforce the supreme law. * * * In *Town of Lake v. Rose Hill Co.,* 70 Ill. 191 (22 Am. Rep. 71), the court, speaking of the police power, says:

'As a general proposition, it may be stated that it is in the province of the law-making power to determine whether the exigencies exist calling into exercise this power. What are the subjects of its exercise is clearly a judicial question.' "

In the case of *McClure v. Nye,* 22 Cal. App. 248, 133 Pac. 1145, the court had under consideration the exception under the referendum constitutional provision, relating to appropriations, and it was there held that the appropriation involved was not of the class specified in the exception, and that it was not within the power of the legislature to so declare. The court said:

"This amendment to the Constitution provides a scheme for the exercise of what is known as the initiative and referendum and, of course, if possible, the language should be construed so as to make effective this reservation of power on the part of the people. It was clearly their purpose, except where the exigency of the public service demanded otherwise, that no legislative enactment should become operative until an opportunity were afforded the people to express their judgment as to the merits of the measure. The time within which a petition may be presented in contemplation of this action by the people is limited to ninety days after the adjournment of the legislature, and hence the manifest propriety of suspending for said period the operation of any measure that should be thus reviewed.

The exceptions provided are ample enough to prevent any menace to the public welfare by reason of such delay incidental to a submission to popular vote, and they should not be given an interpretation so elastic, as virtually to circumvent and nullify the will of the people so solemnly expressed in said constitutional provision.

Nor is this a case where we are bound by the legislative declaration that these appropriations are for 'the usual and current expenses of the state.' If it appeared

that this determination of the legislature might be a lawful and rational conclusion from facts submitted for the consideration of the legislators, then we would be bound to draw the same inference. But we are not dealing with a question involving a possible conflict of evidence or one permitting a different rational solution. The facts appear upon the face of the enactment and the only reasonable conclusion is that such an appropriation is not for the 'usual current expenses of the state.'

The said legislative declaration has no greater effect and is no more binding upon the court than if the legislature had declared that a certain measure is or is not constitutional. In such contingency that question would still remain for the courts to determine. The question before us is simply one of construction or interpretation of an act of the legislature and of a provision of the constitution, and that is a judicial question.''

The exception to the power of referendum, we are considering, is expressed in language too plain to permit of a doubt in construction. Its sole purpose was to grant the General Assembly a free hand and finality of power, in cases only of immediate danger to the public health, peace and safety to the state and its people, such only as may occur by reason of insurrection, invasion, epidemic or other calamity, likely to dangerously effect the welfare of the people as a community, and the state as a government.

Since the decisions of Chief Justice Marshall in the Dartmouth College cases, it has been the policy of the Federal and State courts to determine constitutional limitations upon the exercise of legislative power, and it is now universally held to be the province of the courts to protect the people against infringement upon their governmental rights, plainly expressed in the organic law. The support of the Constitution in this respect is as clearly within the obligation of courts, as is the duty not

to encroach upon the prerogatives of other co-ordinate branches of the government.

The effect of the decision in this case is to completely nullify the expressly reserved right of the people to review the acts of their General Assembly, not in this instance alone, but in all cases. The result is nothing less than a re-writing of the constitutional provision.

The majority opinion offers the consolation to the people that they still have the power, if dissatisfied with this court's construction of their purpose, to initiate an amendment to the present provision; a referendum provision which will take from the general assembly the power which it is said that body now possesses.

This is a generous concession to the people, that they still have the power of initiative, even though their supervisory power of referendum is permitted by the court to be usurped by the General Assembly, which it does by construing the legislative power of that body to be paramount to the reserved legislative power of the whole body of the people.

But if the people still want to leave with the General Assembly the power to legislate in case of immediate necessity for the preservation of the public peace, health or safety only, what language can they use that will more clearly and explicitly express their meaning. The court should suggest language that will meet with its approval, as expressing the desired purpose, lest the proposed initiated amendment prove as abortive as it declares the one we now have.

The majority opinion further contends that the answer to questions propounded by the senate, in *In re Senate Resolution,* 54 Colo. 262, is conclusive as to the present case. An examination will disclose that four questions were propounded by the senate as follows:

"(1) Was the said act approved June 2, 1911, such an act as could be referred to a vote of the people at the

November, 1912, election upon a referendum petition?

(2) If the said 1911 act of the general assembly was a measure that could be referred by a referendum petition, could there legally be submitted to the people by initiative petition at the same election another measure containing a clause repealing said 1911 act? In other words, was it legal when the 1911 act was to be ratified or rejected at the election, to also submit at said election, by initiative petition, a measure repealing, or attempting to repeal, a measure which the people were, at said election, to ratify or reject, and what was the legal effect, if any, of said repealing clause in said initiative measure?

(3) What was the legal effect of both said initiative measure and said referred act receiving a majority vote at the same election? Did both of said measures become the law, or only one of them, and if only one of them, which one?

(4) Is there now any duty devolving upon the general assembly, under the constitutional clause hereinbefore quoted, or has the duty of the general assembly been fully performed?''

The only one of these questions, that can have any sort of reference to the subject under discussion is the first. This question the court expressly declined to answer, for the reason that it applied to a purported completed act, and that rights may have arisen or attached under such referred act. So that what the court said on that subject, after declining to answer the question was mere *dictum*, and can have no binding force. The very nature of the constitutional provision authorizing the court to answer such questions, is, that it is advisory only. The Legislature is not bound by any such answer, and hence it cannot be otherwise of force.

There is no oral argument presented, no printed briefs, and no right to a review or rehearing, as in case of judicial decisions.

The doctrine announced in this particular instance, was simply a flat declaration, without the suggestion of reason or authority.  But if it can be said to have the force of a judicial opinion, and if it is an erroneous and harmful construction of the Constitution, why should it be longer followed in the face of reason and justice?

Shall the reserved power to the people in the Constitution be construed to be denied, because of an erroneous precedent.  Shall the wrong, if it is a wrong, be perpetuated for such a reason.  Shall we continue to hold that the people under their expressly stated and reserved legislative powers, is not a legislative branch of the state government simply because of a mistaken suggestion once made.

It is suggested by the majority, that one election has intervened since the question by the senate was answered, and that this is persuasive that the people do not wish to take from the assembly the power which this court assumes to give it.  It may be answered that the people are not always swift to correct a wrong by means of constitutional amendment.  It was a long, difficult and bitter struggle, to so secure the initiative and referendum amendment.  The people, like the mills of the gods, grind slow, but they sometimes find it necessary to grind exceeding fine.

Precedents that find support in sound reason, and tend to promote justice, are strongly persuasive and generally to be followed; but precedents not so supported, or when for any cause the reason for the rule has ceased to exist, obstruct progress, and should be discarded as being both unjust and dangerous.  The tendency of courts to so generally rely on case law, regardless of existing reasons that may appeal for righteous judgment, is fast becoming a menace to our government.

I may be permitted to suggest, for the consideration of courts and judges who feel impelled to sacrifice their

sense of reason and justice upon the altar of the Golden Calf of precedent, the quaint philosophy of Sam Walter Foss, in the following lines:

One day through the primeval wood a calf walked home, as good calves should;
But left a trail all bent askew, a crooked trail, as all calves do.

Since then, three hundred years have fled, and, I infer, the calf is dead.
But still he left behind this trail, and thereby hangs my moral tale.

The trail was taken up next day by a lone dog that passed that way;
And then a wise bell-wether sheep pursued the trail o'er vale and steep,

And drew the flock behind him, too, as good bell-wethers always do.
So from that day, o'er hill and glade, through those old woods a path was made,

And many men wound in and out, and bent and turned and dodged about,
And uttered words of righteous wrath, because 'twas such a crooked path;

But still they followed—do not laugh—the first migrations of that calf,
And through this winding woodway stalked because he wabbled when he walked.

This forest path became a lane, that bent and turned and turned again;
This crooked lane became a road, where many a poor horse, with his load,

Toiled on, beneath the burning sun, and traveled some
    three miles in one.
And thus a century and a half they trod the footsteps of
    that calf.

The years passed on with swiftness fleet, the road became
    a village street,
And this, before men were aware, a city's crowded
    thoroughfare.

And soon the central street was this of a renowned me-
    tropolis.
And men two centuries and a half trod the footsteps of
    that calf.

Each day a hundred thousand rout followed the zigzag
    calf about;
And o'er his crooked journey went the traffic of a con-
    tinent.

A hundred thousand men were led by one calf near three
    centuries dead.
They followed still his crooked way, and lost one hun-
    dred years a day;

For thus such reverence is lent to well-established prec-
    edent.
A moral lesson this might teach were I ordained and
    called to preach.

For men are prone to go it blind along the calf-paths of
    the mind,
And toil away from sun to sun to do what other men
    have done.

They follow in the beaten track, and out and in, and
    forth and back,
And still their devious course pursue to keep the path
    that others do.

But how the wise old wood-gods laugh, who saw the
    first primeval calf!
Ah! many things this tale might teach;—But I am not
    ordained to preach.

Decided April 3rd, A. D. 1916.    Rehearing denied
May 1, A. D. 1916.