CLARA MAE WHITMIRE, *Appellant,* v. WILLIAM R. JEWELL, M.D., UNIVERSITY OF KANSAS MEDICAL CENTER, et al., *Appellees.*

No. 48,558

MILDRED E. COTTON, *Appellant,* v. WILLIAM DESCHNER, M.D., FRED STEHMAN, M.D., UNIVERSITY OF KANSAS MEDICAL CENTER, et al., *Appellees.*

(573 P.2d 573)

Opinion filed November 5, 1977.

*Robert D. Ochs,* of Topeka, argued the cause and was on the briefs for the appellants.

*Lee J. Dunn, Jr.,* of Kansas City, special assistant attorney general, argued the cause, and *Curt T. Schneider,* attorney general, was with him on the brief for the appellees.

The opinion of the court was delivered by

McFARLAND, J.: This consolidated appeal involves actions for damages brought by the appellants against the members of the Board of Regents of the State of Kansas and others not presently involved for personal injuries sustained by the appellants while they were hospitalized at the University of Kansas Medical Center. The petitions sought recovery on the theories of both tort and implied contract. The University of Kansas Medical Center and the members of the Board of Regents of the State of Kansas moved to dismiss the actions as to them on the grounds they were immune from liability pursuant to K.S.A. 46-901 and that the petitions failed to state claims upon which relief could be granted. The motions were sustained as to all moving parties. From these orders, appellants perfected their appeals. The statement of points and appellants' briefs complain only of the rulings as they relate to the members of the Board of Regents and do not complain of the rulings as to the Medical Center. This does not alter the issues raised as the members of the Board of Regents

were named as defendants because of their supervisory authority over the Medical Center.

The appellants contend that K.S.A. 46-901 and K.S.A. 46-902 are unconstitutional. The appellants raise the same arguments in support of their position as those made in *Brown v. Wichita State University,* 219 Kan. 2, 547 P.2d 1015. The appellants concede that they cannot prevail if *Brown v. Wichita State University,* supra, remains the law of Kansas and seek re-examination of that decision. Shortly after the *Brown* decision came *Malone v. University of Kansas Medical Center,* 220 Kan. 371, 552 P.2d 885, wherein this court stated:

". . . This court's recent exhaustive analysis of the question of governmental immunity and its constitutionality culminated in Justice Schroeder's opinion on rehearing in *Brown v. Wichita State University,* 219 Kan. 2, 547 P.2d 1015, wherein we held that K.S.A. 46-901 is not unconstitutional. We adhere to that determination. . . ." (p. 373.)

This court continues to adhere to that determination.

The appellants also seek determination of whether the Medical Center was engaged in a proprietary or governmental function. This issue need not be determined by virtue of the adherence to *Brown,* supra.

The judgments are affirmed.

OWSLEY, J., dissenting: I dissent. I adhere to the majority opinion in *Brown v. Wichita State University* (Brown I), 217 Kan. 279, 540 P.2d 66, and the dissent in *Brown v. Wichita State University* (Brown II), 219 Kan. 2, 547 P.2d 1015.

According to a survey appearing in the Restatement of Torts (Second), Sec. 895A (Tent. Draft No. 19, 1973), only five states retain governmental immunity at both the state and local levels. Forty-five states have modified and at least partially eliminated the defense of immunity in tort actions against municipal corporations. All except thirteen states have abolished or limited the defense in suits against the state. Since the survey at least two states have acted. In *Jones v. State Highway Commission,* ____ S.W.2d ____ (Mo. September 12, 1977), the court held that sovereign immunity is no longer a bar to tort actions. In *Whitney v. City of Worcester, Mass.,* 366 N.E.2d 1210 (Mass. 1977), the court decided the doctrine would be abolished unless the legislature of the State of Massachusetts acted to modify it during its 1978

legislative session. The Massachusetts court suggests certain limits of liability with which I agree:

1. The traditional distinction between public, as contrasted with commercial, governmental activities should no longer be made. Beginning from a premise of governmental liability within limits, immunity should be retained only where the conduct alleged to be tortious is characterized by a high degree of discretion and judgment. For other tortious conduct, governmental entities should be liable.

2. The distinction between "public officers," as contrasted with "agents" or "employees," should be abolished, and the tortious conduct of all public servants should subject governmental entities to liability based upon the discretionary-ministerial duty test.

3. The misfeasance-nonfeasance distinction which has traditionally governed the personal liability of public officers should be abolished. Instead, personal liability should be determined with reference to the discretionary or ministerial character of the allegedly tortious act.

Any law which has become embedded in our jurisprudence is difficult to remove, even though the courts realize its application is inequitable and unfair. It takes an initial challenge and a continuous clamor of dissatisfaction before a bold and courageous court will strike the law down. Many years may pass before the challenge is effective in every jurisdiction. History teaches us that a challenge based on sound and logical reasoning is eventually successful and mistakes of the past are remedied.

The classic answer to those who regard stare decisis as an immutable rule requiring courts to set their course by the needle on a frozen compass of the ancient past is that given by Mr. Justice Oliver Wendell Holmes:

" . . . It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past. . . ." (Oliver Wendell Holmes, Collected Legal Papers [1920], p. 187.)

In line with these remarks is a poem by Sam Walter Foss, appearing in *Van Kleeck v. Ramer,* 62 Colo. 4, 44-46, 156 Pac. 1108 (1916), which I submit without comment.

One day through the primeval wood a calf walked home, as good calves should;
But left a trail all bent askew, a crooked trail, as all calves do.

Since then, three hundred years have fled, and, I infer, the calf is dead.
But still he left behind this trail, and thereby hangs my moral tale.

The trail was taken up next day by a lone dog that passed that way;
And then a wise bell-wether sheep pursued the trail o'er vale and steep,

And drew the flock behind him, too, as good bell-wethers always do.
So from that day, o'er hill and glade, through those old woods a path was made,

And many men wound in and out, and bent and turned and dodged about,
And uttered words of righteous wrath, because 'twas such a crooked path;

But still they followed—do not laugh—the first migrations of that calf,
And through this winding woodway stalked because he wabbled when he walked.

This forest path became a lane, that bent and turned and turned again;
This crooked lane became a road, where many a poor horse, with his load,

Toiled on, beneath the burning sun, and traveled some three miles in one.
And thus a century and a half they trod the footsteps of that calf.

The years passed on with swiftness fleet, the road became a village street,
And this, before men were aware, a city's crowded thoroughfare.

And soon the central street was this of a renowned metropolis.
And men two centuries and a half trod the footsteps of that calf.

Each day a hundred thousand rout followed the zigzag calf about;
And o'er his crooked journey went the traffic of a continent.

A hundred thousand men were led by one calf near three centuries dead.
They followed still his crooked way, and lost one hundred years a day;

For thus such reverence is lent to well-established precedent.
A moral lesson this might teach were I ordained and called to preach.

For men are prone to go it blind along the calf-paths of the mind,
And toil away from sun to sun to do what other men have done.

They follow in the beaten track, and out and in, and forth and back,
And still their devious course pursue to keep the path that others do.

But how the wise old wood-gods laugh, who saw the first primeval calf!
Ah! many things this tale might teach;—But I am not ordained to preach.

PRAGER AND HOLMES, JJ., join in the foregoing dissent.

FROMME, J., concurring: I concur in the opinion as written for

the majority and add the following remarks. Courts have struggled with the question of governmental immunity for many years. A substantial number of states have abolished or limited the defense in suits against the state but it should be pointed out these states had by judicial decree established the doctrine in the first place. Therefore, what they had adopted by judicial decree they abolished by judicial decree.

The colorful dissent of my brother Owsley entirely disregards the fact that the legislature of Kansas codified the defense of governmental immunity in 1970 by enacting into law K.S.A. 46-901. Therefore this court is not following a crooked calf path but is considering the validity of a statute under our constitution. What was once a path of the court was surveyed by the legislature in 1970 and set up as a way to be followed unless it has some constitutional infirmity. I can find none.