No. 13,433.

In re Senate Resolution No. 2, Concerning the Constitutionality of House Bill No. 6.

(31 P. [2d] 325)

Decision announced December 29, 1933 and opinion filed, as of that date, March 12, 1934.

Mr. PAUL P. PROSSER, Attorney General, Mr. CHARLES ROACH, First Assistant, Mr. PIERPONT FULLER, JR., Assistant, Mr. PETER H. HOLME, Special Assistant, Mr. W. W. GRANT, JR., Special Assistant, affirming the constitutionality of said bill.

Mr. CLAYTON C. DORSEY, Mr. HENRY MCALLISTER, Mr. HORACE N. HAWKINS, SR., Mr. FRANK E. GOVE, amici curiae, denying the constitutionality of said bill.

*En Banc.*

MR. JUSTICE BURKE delivered the opinion of the court.

THE Senate of the Twenty-Ninth General Assembly, now in its second extraordinary session, by Resolution No. 2, unanimously adopted and duly certified, has, under the authority of the second paragraph of section 3 of article VI of the state Constitution, propounded to this court thirteen questions concerning, directly or indirectly, the constitutionality of House Bill No. 6, already passed by the House of Representatives, transmitted to the Senate, and passed by that body on second reading.

The Governor's call for the present extraordinary session of the General Assembly refers to his call for the former session, recites that the emergency therein mentioned "has become even more serious and aggravated," that it is necessary to enact legislation "to allay the present wide-spread public discontent and social unrest * * * to prevent disaster in this critical emergency" and "to defend the State." Then, as provided by section 9 of article IV of the state Constitution, it enumerates the purposes for which the session is called. These are embodied in 19 paragraphs, the first of which reads: "To provide adequate revenues; to make loans and accept grants from the Federal Government; to provide for the financing, construction, repair and improvement of necessary public highways, public buildings and other public works and to authorize the issuance and sale to the Federal Government of debentures or other obligations of the State in connection therewith, and to do any and all other things which shall be deemed necessary to enable this State to meet its obligation to provide relief for the unemployed, indigent and destitute people of this State by means of direct relief or work relief, or both, and to cooperate with the Federal Government in its unemployment relief and National Industrial Recovery programs, and to repeal all acts or parts of acts inconsistent or in conflict with any laws which shall be enacted to accomplish these purposes." The title of House Bill No. 6 is, "A bill for an act to provide for emergency relief and to provide for employment quickly and to defend the

state, by authorizing the issue of highway debentures and the sale thereof to the United States of America, for the purpose of raising money in anticipation of the collection of the excise tax on motor fuels; providing for the redemption of such debentures; repealing chapter 8 of the laws passed at the first extraordinary session of the Twenty-Ninth General Assembly, and all acts and parts of acts in conflict herewith; and declaring an emergency."

The following quotations from the Bill show its general purpose and present so much of its body as is necessary to the present consideration:

"Section 1. A critical emergency, arising out of the present economic depression, which has caused widespread unemployment and consequent indigence and dependence on the part of a large portion of the people of the State of Colorado, and has made hopelessly inadequate federal, state and local relief funds, and has caused distress and hunger in such a degree that the public peace, order, tranquillity and safety are seriously affected and endangered and the processes of orderly government itself imperiled, is hereby declared to exist.

"Therefore it is hereby declared to be the policy and purpose of the General Assembly to allay the present wide-spread public discontent and social unrest, to relieve the needy and destitute citizens of this State from want and privation by making provision for work relief in the form of highway construction, repairs and improvements as authorized by this Act, and thus to protect and defend the State.

"Section 2. As a means of carrying out the purposes of Section 1 hereof and to enable this state to avail itself of the provisions of the Act of Congress approved June 16, 1933, known as The National Industrial Recovery Act, or other acts of Congress, and to effectuate the purposes of this Act, the Governor of the State of Colorado is hereby authorized until January 1, 1935, (1) to construct, finance, or aid in the construction and financing of, public highways; (2) to enter into agreements

with the United States under such terms and conditions as may be prescribed in accordance with The National Industrial Recovery Act, or other acts of Congress, to borrow money in the aggregate amount of not more than Ten Million Dollars ($10,000,000.00), in the manner and for the purpose herein prescribed, and to accept grants from the United States in the manner prescribed by such acts of Congress in partial payment of the money so borrowed; (3) to execute and deliver such instruments of writing, evidencing such loans and grants, as may be required by such acts of Congress, and in the manner provided for by this Act; and (4) to repay such loans and the agreed interest thereon according to the terms and conditions of the instruments evidencing the same.

''Said loans shall be negotiated by the issuance and sale to the United States of America of highway debentures of the State of Colorado in such serial form, in such amounts, not exceeding in the aggregate Ten Million Dollars ($10,000,000.00), payable semi-annually at such times not exceeding twenty years after date, and bearing such interest, not exceeding four per centum per annum, payable semi-annually, all as the Governor of the State of Colorado may determine. No such debentures shall be issued after December 31, 1934. Said debentures shall be payable to bearer * * *. Immediately upon the registration of said debentures by the Auditor of State, he shall deliver the same to the State Treasurer and charge the amount of the purchase price thereof to said State Treasurer as money received by the State Treasurer in the State Highway Fund of the State of Colorado * * *.

''Section 3. There is hereby created in the office of the State Treasurer a fund to be known as the 'State Highway Debenture Redemption Fund'; for the purpose of paying the principal of and the interest to accrue upon the debentures issued under the provisions of this Act.

''Beginning six months in advance of each interest payment date, as fixed by each debenture issued pur-

suant to the terms of this Act, moneys accruing in the treasury of the State of Colorado and credited to the State Highway Fund from the excise tax levied on motor fuels for state highway purposes under the provisions of 'An Act Relating to an Excise Tax on Motor Fuel, and to provide for the disposition of the funds derived therefrom and to repeal Chapter 126 of the Session Laws of Colorado, 1931, and all acts and parts of acts inconsistent or in conflict herewith,' approved April 8, 1933, the same being Chapter 140 of the Session Laws of Colorado, 1933, shall each month be placed in said State Highway Debenture Redemption Fund, equal in amount to one-sixth of such interest payment, until there is sufficient money, but not more, accumulated in said fund to pay such installment of interest on such debenture; * * *.

"Section 4. The amount of money accruing in the treasury of the State of Colorado from said excise tax on motor fuels, as provided in Section 3 of this Act, and equaling the amount of debentures which may be issued and outstanding, with interest thereon, and as collected and accumulated in said State Highway Fund in the manner in said Section 3 provided, is hereby appropriated to, set apart for and shall be paid into and transferred to said State Highway Debenture Redemption Fund, and all moneys accruing or to accrue in the manner set out in this Act for said fund, are appropriated exclusively to and for the payment of said debentures and the interest thereon.

"Section 5. The application and transfer of said moneys arising from said excise tax, as hereinbefore provided, is and shall be a claim and charge on and an application of the same prior and superior to any other charge, claim or application thereof, * * *."

"Section 7. The State Treasurer is hereby authorized, directed and empowered, upon the respective maturities of said debentures and the interest thereon, or the coupons representing interest thereon, if coupon deben-

tures be issued, to pay the same to the bearer out of said State Highway Debenture Redemption Fund, * * *.''

"Section 9. The issue and sale of said highway debentures shall constitute an irrevocable contract between the State of Colorado and the United States of America, and the owner or holder of any of said debentures, that the said excise tax on motor fuels at the rate of four cents per gallon, now in force and effect, shall not be reduced below the amount which the State Treasurer is now required to credit to the State Highway Fund * * *, so long as any of said debentures remain outstanding and unpaid, either as to principal or interest, and that the State of Colorado will cause said tax to be promptly collected and sufficient thereof set aside and applied to pay said debentures and the interest thereon promptly according to the terms thereof; and until all said debentures and the interest thereon shall be fully paid, no law shall be enacted repealing said Act approved April 8, 1933, being Chapter 140 of the Session Laws of Colorado, 1933, nor shall said chapter be amended in such manner as to render impossible or impracticable the making of transfers of funds as in this Act provided, in amounts sufficient to meet the requirements of this Act. However, the issue of said debentures shall not constitute a general obligation of the State of Colorado, but shall be payable solely from the excise tax pledged for the payment thereof.''

"Section 17. The General Assembly hereby finds, determines and declares this Act to be necessary for the immediate preservation of the public peace, health and safety, and to defend the State.

"Section 18. In the opinion of the General Assembly an emergency exists; therefore, this Act shall take effect and be in force from and after its passage.''

The interrogatories now before us are introduced by a recitation of the title of House Bill No. 6, a statement that it has passed the House and passed the Senate on second reading; that, if deemed constitutional, it will

probably pass on final reading; that the Attorney General has given an opinion that it is constitutional; that "the Senate still entertains doubts as to the constitutionality of said bill"; that it is designed to meet the "present critical emergency"; that if unconstitutional it will be necessary at the present session "to enact other relief measures in lieu thereof for the purpose of alleviating unemployment and consequent destitution and suffering among the people of the State, which has grown and persisted to such a degree as to imperil the peace, tranquillity, well-being and safety of the State itself"; and that, in the judgment of the Senate, the question of the constitutionality of the bill is important and the occasion solemn. The interrogatories then propounded are:

"1. Does House Bill No. 6 fall within the purview of the Governor's Proclamation calling the Second Extraordinary Session of the Twenty-Ninth General Assembly of the State of Colorado as provided by Section 9 of Article IV of the Constitution of the State?

"2. Does House Bill No. 6 provide for the creation of a debt of the State within the meaning of Sections 3 and 4 of Article XI of the Constitution of the State of Colorado?

"3. If the answer to question 2 be in the affirmative, does said House Bill No. 6 violate Section 3 of Article XI or Section 16 of Article X of the Constitution of the State of Colorado, notwithstanding the recitals contained in Sections 1 and 17 of said House Bill No. 6?

"4. If the answer to question 2 be in the affirmative, does said House Bill No. 6 contravene Section 4 of Article XI of the State Constitution providing that

'In no case shall any debt above mentioned in this article be created except by a law which shall be irrepealable, until the indebtedness therein provided for shall have been fully paid or discharged; such law shall specify the purposes to which the funds so raised shall be applied, and provide for the levy of a tax sufficient to pay the interest on and extinguish the principal of such debt

within the time limited by such law for the payment thereof, and the funds arising from the collection of any such tax shall not be applied to any other purpose than that provided in the law levying the same, and when the debt thereby created shall be paid or discharged, such tax shall cease and the balance, if any, to the credit of the fund shall immediately be placed to the credit of the general fund of the state.'

"5. Does House Bill No. 6 contravene any of the following provisions of the State Constitution?

(a) Section 2, Article X, which provides:

'The General Assembly shall provide by law for an annual tax sufficient, with other resources, to defray the estimated expenses of the State Government for each fiscal year.'

(b) Section 11, Article X, which provides:

'The rate of taxation on property, for State purposes, shall never exceed four mills on each dollar of valuation.'

(c) Section 16, Article X, which provides:

'No appropriation shall be made, nor any expenditure authorized by the General Assembly, whereby the expenditure of the State, during any fiscal year, shall exceed the total tax then provided for by law and applicable for such appropriation or expenditure, unless the General Assembly making such appropriation shall provide for levying a sufficient tax, not exceeding the rates allowed in Section eleven of this article, to pay such appropriation or expenditure within such fiscal year. This provision shall not apply to appropriations or expenditures to suppress insurrection, defend the State, or assist in defending the United States in time of war.'

(d) Section 33, Article V, which provides:

'No money shall be paid out of the treasury except upon appropriation made by law, and upon warrant drawn by the proper officer in pursuance thereof.'

(e) Section 34, Article V, which provides:

'No appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person,

corporation or community not under the absolute control of the State, nor to any denominational or sectarian institution or association.'?

"6. Does said House Bill No. 6 contravene Article III of the State Constitution by conferring on the Governor the exercise of non-delegable powers properly belonging to the legislative department?

"7. Does the General Assembly have power to confer upon, or delegate to, the Governor the powers described in Sections 2, 11, and 12 of House Bill No. 6?

"8. Does the General Assembly have the power, by said House Bill No. 6, to declare, as provided in Section 9 thereof, in substance, that so long as any debentures authorized thereby remain outstanding and unpaid, either as to principal or interest,

(a) The issue and sale of such debentures shall constitute an irrevocable contract between the State of Colorado and the United States of America, and the owner or holder of any of said debentures, that the excise tax on motor fuels at the rate of four cents per gallon now in force, shall not be reduced below the amount which the State Treasurer is now required to credit to the State Highway Fund under the provisions of Chapter 140 of the Session Laws of Colorado, 1933;

(b) That the State will cause said tax to be promptly collected and sufficient thereof set aside and applied to pay said debentures and the interest thereon promptly according to the terms thereof; and

(c) No law shall be enacted repealing said Chapter 140 of the Session Laws of Colorado, 1933, nor shall said chapter be amended in such manner as to render impossible or impracticable the making of transfers of funds as provided in said House Bill No. 6, in amounts sufficient to meet its requirements?

"9. Are the taxes laid by Chapter 140, Session Laws, 1933, excise taxes or property taxes? Is the limitation imposed by Section 11 of Article X of the Colorado Constitution applicable thereto?

"10. Does that part of Subdivision (b) of Section 10 of Chapter 140, Session Laws, 1933, which requires that twenty-seven per cent of the tax on motor fuel shall be paid by the State Treasurer to the credit of the several counties of the state in the proportions therein stated and 'shall be expended by said counties only in the construction, improvement, repair or maintenance of public highways in said Counties' contravene the provisions of Section 7, Article X of the Colorado Constitution, which provides that the General Assembly shall not impose taxes for the purposes of any county?

"11. If the answer to question 10 be in the affirmative, would such unconstitutionality render invalid the whole of said Chapter 140, or that part of said sub-section (b) of Section 10 thereof which provides that the State Treasurer 'shall pay seventy per cent (70%) to the credit of the State Highway Fund,' particularly in view of the provisions of Section 19 of said chapter?

"12. Does Section 3 of said House Bill No. 6 extend into said House Bill No. 6 the provisions of Chapter 140, Session Laws, 1933, in contravention of Section 24 of Article V of the Colorado Constitution?

"13. Does said House Bill No. 6 authorize the issue of valid obligations to be known as highway debentures of the State of Colorado, substantially of the character and manner described in said House Bill No. 6?''

Section 3 of Article 6 of the Constitution directs that our opinion be given, when required by the governor, the senate or the house, ''upon important questions upon solemn occasions.'' What are such the court must ultimately determine for itself. *In Re Appropriations,* 13 Colo. 316, 22 Pac. 464; *In Re Penitentiary Commissioners,* 19 Colo. 409, 35 Pac. 915; *In Re Senate Bill No. 416,* 45 Colo. 394, 101 Pac. 410.

The present occasion we deem solemn, and some of the questions important, all of which so clearly appears herein as to require no further elucidation; and that said House Bill No. 6, assuming for this purpose only its con-

stitutionality, is within the Governor's call for this extraordinary session, likewise so appears.

To the thirteenth interrogatory our answer is "No," for the reasons hereinafter given in our answers to the second and third.

That portion of said section 3 of article XI here involved reads: "The state shall not contract any debt by loan in any form, except to provide for casual deficiencies of revenue, erect public buildings for the use of the state, suppress insurrection, defend the state, or, in time of war, assist in defending the United States; * * *."

The second question, briefly stated, is, Does said House Bill No. 6 "contract any debt by loan in any form"? If it does, the third question, so stated, is, Is that debt contracted to "defend the state"?

Before attempting to answer these, two general rules of constitutional construction, with the reasons on which they rest, should be noted.

██ The first of these is that every statute, duly passed, must be held constitutional unless the contrary appears beyond a reasonable doubt. *Chicago, B. & Q. R. Co. v. School Dist.*, 63 Colo. 159, 165 Pac. 260; *Broadbent v. McFerson*, 80 Colo. 264, 250 Pac. 852. The reasons for this rule are found in the presumption that public officials, in the discharge of their duties, have acted lawfully; and the fact, of which the courts take judicial notice, that members of the General Assembly have taken an oath to support the state Constitution. Hence follows the presumption that they have not passed an act which violates the fundamental law. It therefore clearly appears that an equally binding rule of legislative conduct is that that department shall pass no law whose constitutionality is a matter of grave doubt, and that if the General Assembly ignores that rule the reason for the judicial presumption of constitutionality disappears and the courts are thus greatly embarrassed in the discharge of the duty devolving upon them. 1 Cooley's Constitutional Limitations (8th Ed.) p. 375.

It will be observed that the judicial presumption above stated is not here applicable because the principal reason upon which it rests is absent. The General Assembly has not passed House Bill No. 6, hence we are not called upon to assume that the Senate, which propounds the questions, is satisfied of its constitutionality. On the contrary it certifies to us that it is not.

 The second general rule of constitutional construction is that the language of Constitutions must, so far as possible, be given its ordinary meaning, and the words thereof their common interpretation. The records of conventions which framed them are resorted to only when other guides fail. In interpreting a law we endeavor to ascertain the intent of those who adopted it. Hence the importance of legislative intent in the interpretation of statutes. 59 C. J., p. 1017, §605. But our Constitution was not adopted by a convention. It is, therefore, not what the members of that convention said or did, when drafting the document for submission to the people, but what the people believed it meant when they accepted it as their fundamental law, which primarily must guide the courts in their interpretation. *Carton v. Sec'y of State,* 151 Mich. 337, 351, 115 N. W. 429, 439; *Newell v. People,* 7 N. Y. 9, 97; *State v. Romero,* 17 N. M. 88, 100, 125 Pac. 617; *Beardstown v. Virginia,* 76 Ill. 34; *Gibbons v. Ogden,* 9 Wheat. 1, 6 L. Ed. 23; *M'Culloch v. Maryland,* 4 Wheat. 316, 4 L. Ed. 579.

Examining now the second interrogatory in the light of these well recognized rules what have we? Here is a bill which, by its express terms, is "to borrow money in the aggregate amount of not more than $10,000,000," "to execute and deliver such instruments of writing, evidencing such loans," "to repay such loans and the agreed interest thereon." A bill which provides that taxes already imposed are "hereby appropriated to, set apart for and shall be paid into" a fund created and maintained for the repayment of the millions so borrowed. A bill which becomes "an irrevocable contract,"

and forbids any amendment or modification of an already existing statute, so as to impair the security, under which the tax in question is now being collected "until all of said debentures [notes of the state for the money so borrowed] and the interest thereon shall be fully paid." And the question is, Does this bill "contract any debt by loan in any form," which section 3 of article XI of the state Constitution says the legislature shall not do? It would seem that these quotations from the bill, set over against this constitutional prohibition, leave nothing to answer. We venture the assertion that no man, able to read and understand ordinary English, however otherwise educated or uneducated, wise or foolish, would question for a moment that this bill was a plain violation of the constitutional prohibition, or find any reason to the contrary, save by a resort to profound legal learning and a doubtful application of judicial precedents. Apparently acquiescing in this position the Attorney General and his assistants raise no such question. They say, in effect, that while House Bill No. 6 appears, prima facie, to contract a debt, it does not in fact do so because payment thereof must be made from a "special fund," and in such cases this and other courts, by a course of reasoning here applicable, have held that no debt is thus contracted within the constitutional prohibition.

In examining this position it must be remembered that the act allocates to the payment of the debt, not anticipated revenue from an improvement or industry created by the act, nor even revenue from a source first tapped by it, but revenue already provided in past years, and at present flowing into the state treasury at the rate of millions of dollars per annum.

Since the purpose of section 3 of article XI is to prevent the pledging of revenues of future years, a statute which at the same time it creates a debt, creates the fund to pay it, and which fund would not be otherwise available for general purposes, is clearly outside the

constitutional prohibition. If, for example, the state could purchase a machine for making gold out of common clay, and agreed to pay for the contrivance only out of the product, that debt would not be prohibited by said section 3. A careful examination into the character of all debts excluded by judicial construction form the prohibition of said section, and sanctioned under the "special fund" doctrine, will demonstrate that they fall clearly within this class. Into it readily fall debts for local improvements to be paid for by special assessments. *City of Denver v. Knowles,* 17 Colo. 204, 30 Pac. 1041; *Milheim v. Moffat Tunnel Imp. Dist.,* 72 Colo. 268, 211 Pac. 649; *Sanborn v. Boulder,* 74 Colo. 358, 221 Pac. 1077.

In such cases the improvement is paid for solely out of the value which it adds to the property of the taxpayer.

Into the same class, and just as clearly, fall debts for public utilities to be paid for from the proceeds of the utility. *Shields v. City of Loveland,* 74 Colo. 27, 218 Pac. 913; *Searle v. Town of Haxtun,* 84 Colo. 494, 271 Pac. 629; *Reimer v. Town of Holyoke,* 93 Colo. 571, 27 P. (2d) 1032. In such cases the utility is paid for solely out of the revenue it produces, or extensions and improvements (if for such the debt is contracted) are paid for out of the increased revenue which they produce. The Reimer case, supra, clarifies the others, holding any impairment of the general municipal revenues violates the prohibition, and that "any obligation paid or contracted to be paid, out of a fund that is the product of a tax levy is a debt within the purpose of the constitutional limitation." These cases arose under section 8 of article XI which imposes upon municipalities the same restrictions, in the same language, as said section 3 imposes upon the state. They fall within the general constitutional policy as heretofore interpreted by this court. *People v. May,* 9 Colo. 404, 12 Pac. 838; *Goodykoontz v. People,* 20 Colo. 374, 38 Pac. 473.

It is said that this bill can be sustained on the theory

of a "continuing appropriation" as upheld in *In Re Continuing Appropriations,* 18 Colo. 192, 32 Pac. 272. But an appropriation made by one General Assembly to pay for services or materials to be thereafter annually furnished, and which "continues" only because future General Assemblies do not, as well they might, discontinue both consideration and payment, and a "continuing appropriation" by a so-called "irrepealable act" to pay in installments, over a long period of years, for services or materials furnished in toto during the current year, are so different in all essential particulars as to have nothing in common save an arbitrary name. If the latter can be upheld under the cloak of continuing appropriations this constitutional prohibition against contracting debts is construed out of existence, for under that cloak any debt may pass.

■ We doubt not the bill contracts a debt by loan in one form. Is that debt contracted to defend the state? On this question the declarations of the executive and legislative departments of the state government, while probably persuasive, are not binding here. If they were, the Constitution would cease to have even the force of a statute. If the people's "Thou shalt not," can be brushed aside by the simple ipse dixit of their servants thus bound, the mandate is impotent. Such a construction, once adopted, breaks the barrier, and future legislatures, protected by the precedent, might pile up mountains of debt on future generations, resulting in inevitable impoverishment or ruthless repudiation. *Marbury v. Madison,* 1 Cranch. 137, 2 L. Ed. 60; *Mugler v. Kansas,* 123 U. S. 623, 31 L. Ed. 205, 8 Sup. Ct. 273; *Lochner v. New York,* 198 U. S. 45, 49 L. Ed. 937, 25 Sup. Ct. 539; *Van Kleeck v. Ramer,* 62 Colo. 4, 156 Pac. 1108. While the last case upholds the power of the General Assembly, by declaration, to exempt an act from the provision of the constitutional referendum, it clearly repudiates its power to bring prohibited legislation within its jurisdiction by the same method.

That an emergency, and a grave one, exists, we doubt not. That legislative action to meet it is imperative is equally certain. But that such action is "to defend the state" will not appear until it appears that the state is attacked or threatened. It has been argued, with force and logic, that such attack or threat must be by force of arms, and that argument finds support in the recorded proceedings of our constitutional convention. But accepting the interpretation put on those proceedings by counsel who maintain that position it is still not conclusive, though it has heretofore been indicated, at least, by this court, that the phrase should be so interpreted. *In Re Appropriations,* 13 Colo. 316, 22 Pac. 464; *Parks v. Soldiers' and Sailors' Home,* 22 Colo. 86, 43 Pac. 542; *In Re State Board of Equalization,* 24 Colo. 446, 51 Pac. 493. Whatever the fact, we find it unnecessary here and now to determine it. If the attack or threat from which it becomes necessary "to defend the state" be not limited to force, it must at least be one equally grave in its possible consequences, and one requiring equally strenuous measures to meet; otherwise the ordinary processes of legislation will suffice and must be resorted to. Certainly the emergency arising from the unemployment of the comparatively small number of men to whom this proposed act would give work on the highways of the state does not rise to the solemnity of such an attack or threat, and no facts are presented which lead to such a conclusion. Were it otherwise we can not close our eyes to the natural conditions involving such employment. It is now almost January 1, and the very nature of the proposed work forbids that it could be in full swing, employing anything like its full complement of men, before spring. Months must elapse before the alleged defense can become reasonably effective. Meanwhile the present emergency, in its most serious aspects, must probably pass. If there were such a present attack or threat the proposed legislation would be wholly impotent to afford the state any present de-

fense against it. We further observe that our Constitution was adopted in 1876. The men who framed it, and those who adopted it, were not without experience, history tells us, of grave economical and industrial emergencies. These must have been in mind when they so acted, but they gave no permission to the legislature to violate their mandate in emergencies. They gave permission to contract "a debt by a loan in any form" to "defend the state" and most of them had lived through a period when strenuous measures were necessary to defend the state and well knew the meaning of the words they used. In all other cases they forbade the consumption of anticipated revenues of future years and limited their lawmakers to the adoption of usual or unusual taxing measures, or a new allocation of revenue already provided. The present emergency must be so met.

Despite such definite declarations of the United States Supreme Court as are found in *Ex parte Milligan*, 4 Wallace 2, *Boyd v. United States*, 116 U. S. 616, 635, 29 L. Ed. 746, 6 Sup. Ct. 524, and similar cases, that ancient heresy, that whatever is deemed necessary by those in authority is lawful, has returned in these days of distress, as justification for so-called emergency legislation, whose unconstitutionality, in times of prosperity, would be conceded. It has been given new life in recent years by such cases as *Block v. Hirsh*, 256 U. S. 135, 65 L. Ed. 865, 41 Sup. Ct. 458; *Marcus Brown Co. v. Feldman*, 256 U. S. 170, 65 L. Ed. 877, 41 Sup. Ct. 465, and *Levy Leasing Co. v. Siegel*, 258 U. S. 242, 66 L. Ed. 595, 42 Sup. Ct. 289. Their influence is here reflected in portions of the arguments before us, as well as in the opinion of the Attorney General given the Senate upholding the constitutionality of the bill. Therein he says: "It is also important to note that said House Bill No. 6 is an emergency measure," and closes with the statement "It is our opinion that House Bill No. 6, if enacted into law, as an emergency measure, would be, in all respects, valid and constitutional." On this point our own conclusions,

definitely reached and unequivocally stated, in *Walker v. Bedford,* 93 Colo. 400, 26 P. (2d) 1051, should leave no doubt that, in this jurisdiction, the bulwarks erected in former times still stand unshaken. High dikes are built for great floods.

It has been said, in substance, that this bill, by a "broad" construction, may be squared with the Constitution, and that only by a "narrow" construction can it be made repugnant thereto. That position rests upon an erroneous interpretation of those terms, and follows the popular fallacy that all interpretation which upholds legislation is broad and all which overthrows it is narrow. Whether constitution or statute is involved, that interpretation which, brushing aside minor objections and trivial technicalities, effectuates the intent of the act, is a broad interpretation, and that which, regarding such objections and technicalities, fails to do so, is narrow. Here we are called upon to interpret not the bill, but the Constitution. The purpose of the people in adopting the section involved is clear, i. e., to keep the state substantially on a cash basis, to prohibit the pledge of future fixed revenues, to forbid the contracting of debts which must be paid therefrom, and to make certain that one general assembly shall not paralyze the next by devouring the available revenues of both. *People v. May,* 9 Colo. 80, 10 Pac. 641; *Parsons v. People,* 32 Colo. 221, 76 Pac. 666. Hence the construction which resorts to technical terms and fine distinctions to frustrate that intent is narrow, and that which imports its common meaning to simple language to effectuate that intent is broad. We must not be frightened by mere words.

Our answers already given to those interrogatories hereinbefore considered make it unnecessary to answer the remainder. They cease to be "important questions" as that term is used in the Constitution. To properly answer them would require "a wholesale exposition of all constitutional provisions relating to a given general subject" (i. e. Revenue). Such an exposition does not

fall within the requirements of said section 3 of article VI. *In Re Senate Resolution,* 9 Colo. 620, 21 Pac. 470. Moreover, the creation of a prohibited debt runs through every important section of the bill in question. With that eliminated nothing of moment remains.

Before concluding this opinion it seems proper, in view of the many past instances as disclosed by our reports of executive and legislative misunderstanding of the scope and purpose of said section 3 of article VI, to say that the present interrogatories, so far as herein answered; the crucial points of the bill involved; the crisis in its passage at which the court's opinion was sought; and the method followed in presenting the problem here; so clearly follow the Constitution as heretofore interpreted, and present the vital questions so fully and fairly, as to supply a model for future proceedings when either House may deem it wise to invoke the provisions of said section 3.

Some comment on the position and labors of counsel in this case seems likewise appropriate. Amici curiae are not volunteers herein, nor do they represent, directly or indirectly, private interests. They were appointed by this court with an eye single to the service they might render the state. While we knew nothing of the views they then held, if any, respecting the validity of the proposed act, we had reason to believe that, if the questions were close, they might not be in accord, and that in any event every important phase of the problem would be ably elucidated by some of them. In this we have not been disappointed. It happens that each has reached the conclusions herein announced, though differing to some extent in their reasoning, and not in harmony on certain of the interrogatories which we have considered it unnecessary to answer. Their time and talents have been contributed without compensation. The Attorney General advises us that the same is true of his special assistants who appear at the request of himself and the Governor, while he and his regular staff have been tire-

less and thorough in their preparation and presentation. To all these the thanks of court and people are due. While a state is so served her interests are safe.

Interrogatories 1, 2, 3, answered in the affirmative, interrogatory 13 in the negative, and the Bill held unconstitutional.

MR. CHIEF JUSTICE ADAMS, MR. JUSTICE CAMPBELL and MR. JUSTICE HILLIARD concur.

MR. JUSTICE BUTLER, MR. JUSTICE BOUCK and MR. JUSTICE HOLLAND dissent.

MR. CHIEF JUSTICE ADAMS, specially concurring.

I think the legal position as set forth in the majority opinion is sound, but perhaps the following words therein contained, found on page 114 of this volume, may be open to misconstruction: ''We venture the assertion that no man, able to read and understand ordinary English, however otherwise educated or uneducated, wise or foolish, would question for a moment that this bill was a plain violation of the constitutional prohibition, or find any reason to the contrary, save by a resort to profound legal learning and a doubtful application of judicial precedents. Apparently acquiescing in this position the Attorney General and his assistants raise no such question.''

I am authorized to say that the author of the opinion, and all of the justices who concurred therein agree that the quoted language was used only by way of emphasis and that no reflection upon anyone was intended and it should not be so construed. I know also that every attorney who appears in this matter enjoys the confidence and esteem of the entire court. Their valuable services are acknowledged in the main opinion.

MR. JUSTICE BUTLER, dissenting.

1. The bill in question was passed by the House and sent to the Senate, where it was passed on second read-

ing. The Senate resolution states that the bill probably will pass on third and final reading if the bill is deemed constitutional. The resolution contains the recital, customary on such occasions, that the Senate entertains doubts as to the constitutionality of the bill. The Senate wants to know whether or not, *if the bill is enacted,* the statute would be in conflict with certain specified provisions of the Constitution; therefore, the test to be applied is the same as though the bill had become a statute. A statute cannot be declared unconstitutional unless, beyond a reasonable doubt, it conflicts with some provision of the Constitution. Four of the justices and four of the lawyers appearing in the case believe that, beyond a reasonable doubt, the bill provides for the creation of a debt in violation of section 3 of article 11 of the state Constitution. Three of the justices and five of the lawyers, including the Attorney General, believe that no such conflict exists; and the House of Representatives also took this view, or it would not have passed the bill. Such was the situation when the following statement was inserted in the majority opinion: "It would seem that these quotations from the bill, set over against this constitutional prohibition, leave nothing to answer. We venture the assertion that no man, able to read and understand ordinary English, however otherwise educated or uneducated, wise or foolish, would question for a moment that this bill was a plain violation of the constitutional prohibition, or find any reason to the contrary, save by a resort to profound legal learning and a doubtful application of judicial precedents." That statement should not be permitted to pass without comment. It was well calculated to stifle opposition and to silence all who have the preposterous presumption to differ with the majority in opinion and the temerity to express their views. I concede that the majority possess intelligence and legal ability and are sincere; but as I do not concede to them infallibility, I take the liberty, not-

withstanding the statement quoted above, of questioning the soundness of their conclusions.

2. In their arguments the lawyers reminded us that no emergency can justify a waiving or suspension of constitutional provisions, and our attention was called to the forceful language of Mr. Justice Hilliard in Walker v. Bedford, 93 Colo. 400, 408, 26 P. (2d) 1051, 1054. All of the justices are in accord with those sentiments. All of us have taken an oath to support the federal and state Constitutions, and it may be assumed that each of us understands the nature and binding force of that oath. The court is not, and never has been, divided on the question whether or not the Constitution is the supreme law and binding upon all. The question in the Walker case was not, as some suppose, whether or not constitutional provisions can be waived or ignored by the court, but whether the statute there in question came within the inhibition of certain provisions of the Constitution. A similar question is involved in the present proceeding.

3. Section 3 of article 11 of the state Constitution provides: "The state shall not contract any debt by loan in any form, except to provide for casual deficiencies of revenue, erect public buildings for the use of the state, suppress insurrection, defend the state, or in time of war, assist in defending the United States."

In the majority opinion it is said that the bill before us contemplates the contracting of a debt within the meaning of that provision and for that reason is unconstitutional. I am unable to concur in that view. To arrive at a correct decision of this question, it is necessary to consider the bill as a whole; taking a few detached expressions is likely to lead to a wrong result.

I fear that the majority opinion gives too much weight to certain words occurring in the bill, such as "borrow," "loans," "repay such loans," etc., and does not sufficiently consider the act as a whole and the purpose thereof. "He who considers merely the letter of an instrument goes but skin-deep into its meaning." Broom, Legal

Maxims (7th Ed.) 685. The words of a statute, taken literally, are not always a safe guide to its true meaning. A Bolognian law provided "that whoever drew blood in the streets should be punished with the utmost severity." "After a long debate," it was held that the law did not extend to a surgeon who opened the vein of a person who had fallen down in the street in a fit. 1 Blackstone's Commentaries, p. 60. Although it is improbable, it is not impossible that the prosecuting officer, pointing to the letter of the law, ventured the assertion that no man, able to read and understand, however otherwise educated or uneducated, wise or foolish, would question for a moment that the surgeon was guilty of a plain violation of the law, or find any reason to the contrary, save by a resort to profound legal learning and a doubtful application of judicial precedent. But, be that as it may, the court, in construing the law, did not stick to the letter, which "killeth," but adhered to the spirit, which "giveth life." A statute of Edward II enacted that a prisoner "who breaks jail shall be guilty of felony." The statute was held not to extend to a prisoner who broke out when the prison was on fire, "for," as Plowden explains, "he is not to be hanged because he would not stay to be burned." Coudert, Certainty and Justice, p. 161. We repeatedly have construed statutes according to their spirit, when their strict letter seemed to call for a different result. See, for example, *Brown v. State,* 5 Colo. 496; *Aggers v. People,* 20 Colo. 348, 38 Pac. 386; *Armstrong v. Simonson,* 84 Colo. 472, 271 Pac. 627.

Just what does the bill in question provide? At the regular 1933 session the General Assembly passed an act imposing an excise tax on motor fuel. S. L. 1933, c. 140. It provides, among other things, that after 3 per cent of the proceeds derived from the tax have been used for purposes not important here, 70 per cent of the balance shall be placed to the credit of the state highway fund. §10 (a), (b). The title to the bill now before us, so far as pertinent here, is as follows: "An act to provide for

emergency relief and to provide for employment quickly and to defend the state, by authorizing the issue of highway debentures and the *sale* thereof to the United States of America, for the purpose of raising money in anticipation of the collection of the excise tax on motor fuels; providing for the redemption of such debentures; * * *.''

The act provides that to carry out its purpose and to enable the state to avail itself of the provisions of the congressional act of June 16, 1933, known as the National Industrial Recovery Act, money not exceeding $10,-000,000 may be borrowed from the United States; that ''highway debentures'' for the amount of the money received shall be executed and delivered to the United States, and the money received shall be placed in the state highway fund; that from time to time there shall be transferred from the state highway fund to the state highway debenture fund sufficient money to pay the highway debentures, and that the money shall be used for that purpose only; that any grant to the state made under the National Industrial Recovery Act or other acts of Congress shall be paid into the state highway debenture redemption fund to be used only for the purpose of paying the highway debentures; that all such debentures ''shall be paid solely from the state highway debenture redemption fund and not otherwise''; that ''the issue of said debentures shall not constitute a general obligation of the State of Colorado, but shall be payable solely from the excise tax pledged for the payment thereof''; and that the state shall cause the excise tax to be promptly collected and applied to the payment of the debentures, and in the meantime shall not alter the existing statute so as to impair the security. The money received from the sale of the debentures can be used only for the purpose of constructing, repairing and improving the public highways; and the bill provides that when the present emergency shall have ended no further agreement for the construction of highways or related projects under the act shall be entered into. In the title and repeatedly

in the act the transaction between the state and the United States is referred to as a "sale" and a "purchase." Thus, the governor is authorized "to order the sale to the United States" of the debentures, and to "enter into a contract with the United States * * * for the purchase of said debentures." There are provisions as to what shall be done "after the sale of said debentures" and "upon receipt of the full purchase price of said debentures," and how the expenses of making the "sale" of the debentures shall be paid.

It is submitted that if the bill were enacted, the intent, meaning and effect of the statute would be as follows:

It would not add to the burden of the general taxpayers; the general taxes would not be increased by the fraction of a cent; the taxpayer would pay exactly what he is now paying—no more and no less. Although it does not go to the validity of the act, it may be noted, in order to correct the mistaken notion that the taxpayers' burden would be made heavier, that it would not even add one cent to the burden of those paying the excise tax. That tax, both as to amount and time of payment, would remain exactly the same as it is under the statute now in force.

Instead of increasing the taxpayers' burden, it would greatly lessen it by enabling the state to receive from the United States a grant of work relief funds, under the National Industrial Recovery Act, to the extent of several million dollars.

It would not divert to the payment of the debentures any part of the general tax fund of the state.

It would not change in any particular the use to which the excise tax on motor fuel is applicable, namely, road work. It would merely enable the state, by issuing debentures anticipating the collection of the excise tax, to do at once, while the emergency is great, identically the same road work that would be done in any event, but

that in the absence of the bill would have to be spread over a period of several years.

The credit of the state would not be pledged for the payment of either principal or interest. If the excise tax should prove insufficient to take care of the debentures, no other fund of the state could be resorted to to make good the deficiency. This would be as well known to the holder of the debentures as to the state.

The obligation assumed by the state would be, not to pay the debentures with the proceeds of general taxes, but to collect the excise tax promptly and apply it to the satisfaction of the debentures.

As the excise tax is collected, the state would hold the proceeds as trustee for the benefit of the assignee of the fund, i. e., the holder of the highway debentures.

Whether we view the contemplated transaction between the state and the United States as a loan or a purchase by the latter, the transaction, in substance, would be an assignment by the state, *without recourse upon the state,* of so much of the motor fuel tax as may be necessary to reimburse the United States for the money advanced.

The transaction would not constitute a contracting of a debt within the meaning of section 3 of article 11 of the Constitution.

What is meant by the word "debt" depends on the context, the general subject with reference to which it is used and the purpose sought to be accomplished. As we said in *Shields v. City of Loveland,* 74 Colo. 27, 218 Pac. 913, "The definitions of the word debt are many." If the state borrowed money on the general credit of the state, and as collateral security for the loan pledged the proceeds of an excise tax, there would be created a general obligation of the state, and this would be a debt within the meaning of the constitutional provision in question. That, of course, is not this case. But if, as in the present case, the transaction does not constitute a general obligation of the state, it does not constitute a debt within the inhibition of the Constitution. For ex-

ample, if there is a valid tax levy and labor and supplies are obtained and are paid for by warrants, certificates, debentures or bonds which are made payable only out of the taxes when collected, there is no creation of a debt in the constitutional sense, because no general obligation of the state is created. If, instead of paying for the labor and supplies by delivery of such warrants, certificates, debentures or bonds, thereby making it necessary for the one receiving them to convert them into cash, the state itself obtains the money thereon and pays for the labor and supplies with the money so received, the result is the same; in each case the instruments, in effect are assignments of all or part of the taxes to be collected—an assignment *without recourse on the state.*

The meaning of such debt-limitation provisions in Constitutions has been clearly explained by the Supreme Court of Alabama in *Alabama State Bridge Corporation v. Smith,* 217 Ala. 311, 116 So. 695. An act pledged the bridge tolls, the surplus from the gasoline tax and the receipts from the convict department to the payment of bonds issued to pay for bridge construction. It was held that this did not create a debt within a constitutional provision that ''no new debt shall be created against or incurred by this state,'' with certain exceptions, etc. The court said: ''Our judgment is that 'debt,' within the meaning, the purview, the whole content, of the constitutional provision, is that which the state in any event is bound to pay, an obligation secured by the general faith and credit of the state. Bonds that may be issued for the construction of bridges under this act will not evidence such an obligation—will not be so secured. * * * There is no promise on the part of the state to pay in any event; there is no pledge that there will be a surplus of any fund; there is no pledge of the general credit of the state; there will be no debt within the meaning of section 213.''

The distinction suggested above has been recognized repeatedly by this court. In *People v. May,* 9 Colo. 80,

10 Pac. 641, the court construed the constitutional provision (§6, art. 11) that "the aggregate amount of indebtedness of any county," etc., shall not exceed a certain amount, and held that in determining the amount of indebtedness county warrants are to be taken into account. That the court meant general, not anticipatory, warrants is clear, for the court observed: "Whether the doctrine recognizing the right to anticipate, by assignment, revenue levied but uncollected, by warrants drawn thereon and accepted absolutely in payment, is admissible under our statutes, we do not now determine. The case, as it stands, does not present this question."

In *People v. May,* 9 Colo. 404, 12 Pac. 838, it was held that a warrant or other instrument having the effect of an assignment pro tanto, without 'recourse upon the county, of a fund to accrue from the current levy of taxes, accepted as full payment for labor or material does not create a debt within the meaning of the Constitution. The court said: "Since, in such case, the assignee takes all the risk if the taxes are not collected, relying simply upon his right to compel the proper officers to perform their duty in the premises, no liability, contingent or otherwise, attaches to the county. * * * The warrant now in controversy was issued after the constitutional limit of indebtedness had been reached by the county. It is general in form. It does not purport to be payable from any particular fund, or out of the revenue from the taxes of any specified year. Nor do counsel claim, in the pleadings or argument, that, when the instrument issued, it was the intention to restrict in any manner the county's liability for the supposed indebtedness represented thereby. This warrant cannot be treated as an assignment under the views herein expressed."

Such an assignment, of course, must be based upon a valid levy; hence if the county revenue beyond the current year were attempted to be assigned such assignment would be ineffective, not because it would create a debt, but because such levy would be invalid. The levy itself

cannot be anticipated and drawn upon. *Goodykoontz v. People,* 20 Colo. 374, 38 Pac. 473. No such situation is presented where, as here, there is an assignment of anticipated receipts from the motor fuel excise tax, because the provision for that tax is valid and effective beyond the biennial period; that constitutes a valid levy that will support anticipatory warrants or debentures.

In *In re Canal Certificates,* 19 Colo. 63, 34 Pac. 274, a statute provided that the expenses of constructing a state canal were to be met in part by "certificates of *indebtedness,*" payable only out of funds received for carriage of water, or in payment for lands, and that they shall not in any event become a claim against the state, except as to said funds. It was held, notwithstanding the use of the word "indebtedness," that the act was not in conflict with the constitutional provision fixing a limitation upon state indebtedness.

In *Shields v. City of Loveland, supra,* money for the completion of an electric light plant was to be obtained by issuing municipal bonds, payable only out of the revenue derived from the plant. We held that the bonds, if issued, would not create a debt in the constitutional sense, saying: "Plaintiffs in error insist, however, that the revenue bonds constitute a debt, and so the lawful limit is exceeded. We do not think that they amount to a debt within the intent of the Constitution or statute. The definitions of the word debt are many, and depend on the context and the general subject with reference to which it is used. 17 C. J. 1371. Its meaning in the sections of the Constitution and statutes now before us must be determined by their purpose, which was to prevent the overburdening of the public, and bankruptcy of the municipality. Clearly the revenue bonds are not within that purpose. The public can never be overburdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay. Nor are these bonds a technical debt. Nothing is my

debt unless a judgment for its amount can be recovered against me upon it."

In *Franklin Trust Co. v. City of Loveland,* 3 F. (2d) 114, the court passed upon the same question, with the same result, saying (p. 116): "There is no ground for a claim that the bonds are to be a lien on the plant, or that the holders could look to the plant for their payment; nor can *general* taxation be resorted to for that purpose. The opinion of the State supreme court can mean nothing else." (Italics are mine.)

In *Searle v. Town of Haxtun,* 84 Colo. 494, 271 Pac. 629, we followed the Shields case. Great reliance is placed by the opponents of the bill before us upon the following statement of Mr. Justice Denison in his opinion in the Searle case: "If a tax was required there was of course a debt." That the tax referred to is a general property tax cannot be doubted. See 3 F. (2d) 114, 116, supra; and the plaintiff's citations in the Searle case. Distinguishing the cases cited by the plaintiff, the court said in the Searle case: "Plaintiff's cases on the other hand, with one exception, show that the bonds there in question required either a tax beside the income, to pay them, or that there was a mortgage or pledge of property for that purpose. If a tax was required there was of course a debt, and, while we do not concede that a mortgagor in a mortgage to secure the debt of another becomes thereby a debtor for that debt, yet there is a substantial difference between a mortgage of property, by which it may all be lost and the city thus compelled, in substance, to pay, and a pledge of its future income, by which the property cannot be lost, but the city only compelled to devote the income of the improved property thereto. See *City of Bowling Green v. Kirby, supra.*

"The one exception is *Schnell v. Rock Island,* 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N.S.) 874, but even in that case the ordinance provided that one source of revenue for the payment of the bonds was to be special taxes. However, bonds payable by special assessments are

everywhere held not to be debts of the municipality, so, we must regard this case as an authority in favor of plaintiff in error; but we follow *Shields v. Loveland, City of Bowling Green v. Kirby* and *Winston v. Spokane, supra,* and hold that the proposed bonds are not debts of the town.''

The attorneys who attack the constitutionality of the act contend that the recent case of *Reimer v. Town of Holyoke,* 93 Colo. 571, 27 P. (2d) 1032, conclusively determines that the act before us contemplates the creation of a debt in violation of section 3 of article 11 of the Constitution. I submit that that case not only does not sustain that contention, but clearly supports the position taken in this opinion. The contract involved in that case was for the purchase of two Diesel engines and equipment to take the place of two engines and equipment already in use for the generation of electric current at the municipal plant. The contract provided that deferred installments of the purchase price should be evidenced by municipal pledge orders payable only from the net revenue of the light plant. But in addition to that, and this is what moved the court to decide as it did, the contract required the town to expend large sums of money that could come only out of the town's general funds raised by taxation. Beyond question, this created a general obligation of the town. In addition to that, the contract required the town to divert to the special fund considerable sums of money from the funds raised by general obligation of the town. In addition to that, the condetails; they are set forth fully in the opinion in that case, and show the glaring difference between the situation in that case and that presented by the record in this proceeding.

The very point now being discussed has just been decided by the Supreme Court of Kansas. At a special session in 1933 the Kansas Legislature passed an act authorizing the state highway commission to borrow money from the United States to be used for the pur-

poses stated in the act, namely, the construction, reconstruction, improvement and maintenance of state highways and bridges, and providing for the pledging, as security for the loans, of warrants payable solely from funds derived from gasoline taxes and motor vehicle license taxes. In *State v. Kansas State Highway Commission,* (Kan.) 28 P. (2d) 770, it was held that that act did not provide for the contracting of a debt within the inhibition of section 6 of article 11 of the Kansas Constitution. That section and section 5 provide:

"Sec. 5. For the purpose of defraying extraordinary expenses and making public improvements, the state may contract public debts; but such debts shall never, in the aggregate, exceed one million dollars, except as hereinafter provded. Every such debt shall be authorized by law for some purpose specified therein, and the vote of a majority of all the members elected to each house, to be taken by the yeas and nays, shall be necessary to the passage of such laws; * * *.

"Sec. 6. No debt shall be contracted by the state except as herein provided, unless the proposed law for creating such debt shall first be submitted to a direct vote of the electors of the state at some general election; and if such proposed law shall be ratified by a majority of all the votes cast at such general election, then it shall be the duty of the legislature next after such election to enact such law and create such debt, subject to all the provisions and restrictions provided in the preceding section of this article."

The court said: "The debts referred to in Article 11, sections 5 and 6, supra, are debts to be paid by a general property tax. This is clear from the reading of the sections. What the framers of our Constitution were guarding against was the incurring of debts in excess of a million dollars payable by a general property tax without the question having been submitted to and adopted by the people. They regarded property as the basis of taxation. * * * They were not dealing with the question

of obligations to be paid only by special tax, such as on motor vehicles or motor fuels, or from funds raised in some manner other than by general property tax.''

Another case dealing with the question under discussion here is *State v. Moorer*, 152 S. C. 455, 150 S. E. 269. The Constitution of South Carolina prohibits an increase of the state's public debt, except for ordinary and current business, without a vote of the qualified electors authorizing it. A statute provides for the financing of the construction of state highways through the issuance by the governor and the state treasurer of state highway certificates of indebtedness and notes. The act further provides: ''The full faith, credit and taxing power of the State are hereby pledged for the payment of the principal and interest of the State Highway certificates of indebtedness and notes authorized by this Act.'' It provides, also, for the pledging of the proceeds of the gasoline and motor vehicle taxes for the payment of the certificates and notes. The court consisted of five Supreme Court justices and fourteen Circuit judges. Two of the former and eleven of the latter joined in deciding that the act did not violate the constitutional provision in question, since the pledged taxes probably would be suffiicient to pay the certificates and notes. The minority were of the opinion that the pledging of the taxes did not relieve the state from its primary obligation ''any more than the assignment of collateral to a note would relieve the maker from his primary obligation upon it.'' In the dissenting opinion it is said: ''The point is simply this: Where there is created no obligation on the part of the state, and the proposed improvements are to be paid for out of a designated special source of income, the state is but a trustee of an express trust, to apply such income to the stated purpose, incurring no liability itself other than what might spring from a discharge of that trust; but where, in addition to its trust relation, the state has expressly assumed the payment of the obligations, the

existence of the trust relation will not relieve the express obligations from the character of debts.''

In other words, the nineteen members of the court agreed that if the South Carolina act were the same as the bill before us, it would not provide for the contracting of a debt within the inhibition of the Constitution; a position that the majority of the justices of this court venture to assert would be taken by no man, ''learned or unlearned, wise or foolish.''

In *Briggs v. Greenville County*, 137 S. C. 288, 135 S. E. 153, the state agreed to repay to the counties and highway districts, from a special fund consisting of the proceeds derived from the gasoline tax and the automobile license tax, and federal aid money, the moneys advanced by them for road construction. The court held that this did not constitute the incurring of a debt within the meaning of the Constitution, saying:

''The proposed reimbursement agreements will not constitute a general liability of the state. The reimbursements to be made thereunder can be made only from a special fund consisting of the gasoline tax, automobile license tax, and federal aid. No property tax can ever be levied to meet these obligations.

''Is such a limited liability a debt of the state in the constitutional sense? The underlying purpose of the constitutional provisions concerning the creation of state debt was that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subjected to taxation. This purpose will not be defeated if it should be held by this Court that a debt for the construction of a state highway system, payable exclusively from federal aid moneys and special license taxes to be borne by the persons who will derive the principal benefits from the state highway system, is not a debt of the kind required by the Constitution to be approved by the voters of the state before it is incurred. According to the weight of authority in other states, such

a debt does not fall within the terms of such a constitutional provision."

That case was cited with approval in *California Toll Bridge Authority v. Kelly,* (Cal.) 21 P. (2d) 425. And see *In re Opinions of the Justices,* 220 Ala. 539, 126 So. 161.

I submit that, in reason and upon authority, if the bill before us should be enacted, the statute would not provide for the contracting of a debt within the meaning of section 3 of article 11 of the Constitution.

4. If the majority were correct in assuming that the act contemplates the contracting of a debt in the constitutional sense, the bill, I submit, would come within the exception, for it would be a debt contracted to defend the state.

It is said that the people intended that the exception should apply to defense of the state against armed aggression only, but the history of the section, as well as its language as finally adopted, forbid such construction. There were able lawyers and statesmen in the constitutional convention. That they selected deliberately and only after careful consideration the language appearing in the section, and that they rejected words that would support the contention of counsel, amply appears from the Proceedings of the Constitutional Convention. In the resolution, as originally offered, the exception was worded thus (p. 71) : "for the purpose of repelling invasion, suppressing insurrection or defending the State in time of war." An offered amendment read (p. 158) : "to * * * repel invasion, suppress insurrection, defend the State, or assist in defending the United States in time of war, or provide for the defense of the State when threatened by hostilities." The language of the original resolution and that of the proposed amendment were rejected, and the section, as adopted by the convention, reads as follows (Constitution, article 11, section 3) : "to * * * suppress insurrection, defend the state, or, in time of war, assist in defending the United States." Thus it

appears that the very provisions that counsel ask us to read into the section by implication were deliberately rejected by the framers of the Constitution.

A similar situation was presented in *People v. May*, 9 Colo. 80, 10 Pac. 641. After tracing the history of a certain section from the time it was reported to the constitutional convention by its appropriate committee until its final passage, and noting that at one stage of the proceeding the word "such" was inserted before the word "indebtedness," but later, and finally was stricken, we said:

"We are not to presume that the framers of the constitution did not understand the force of language. This *action* of the convention shows conclusively an *intention*, shows conclusively that they intended that the section should stand, and be read, understood, and adopted by the people, as expressing a meaning different from the meaning which the word 'such,' inserted as indicated, would give to the section. Thus we see that this word, which we are asked to interpolate into the section, 'is a stone which the builders rejected.' We are not at liberty to restore it to, and make it the 'head-stone' of, the section.

"While the ultimate inquiry is always the intent of the people who adopted the constitution, the intention of its framers is an associated inquiry."

Even the debates in Congress concerning a proposed constitutional amendment to be submitted to the states, have been said by the Supreme Court of the United States to be "valuable as contemporaneous opinions of jurists and statesmen upon the legal meaning of the words" used in the constitutional amendment. *United States v. Wong Kim Ark*, 169 U. S. 649, 699, 18 Sup. Ct. 456.

It is submitted that the expression "defend the state" was not intended to be limited to defense against armed aggression. That it must be given some effect is obvious. It is not necessary to speculate concerning the various situations in which indebtedness may be incurred for the

defense of the state. The only question with which we are concerned at this time is whether such a situation existed when the Senate sought our advice.

In his proclamation of July 29, 1933, calling a special session of the General Assembly, the Governor declared that: "* * * the present nation-wide economic depression has created a serious emergency in this State due to widespread unemployment and consequent indigence and dependence of a large portion of the people of this State; * * * that the increasing inadequacy of federal, state and local relief funds to relieve the situation has resulted in existing and ever threatening deprivation of thousands of families and individuals in this State of the necessities of life; * * * and that because of the conditions aforesaid, distress and hunger exist among our people in such a degree that the public peace, order, tranquillity and safety are seriously affected and endangered and the processes of orderly government itself imperiled."

In his proclamation of December 2, 1933 calling the second special session, the Governor declared, in substance, that the emergency declared in the former proclamation persists and has become even more serious and aggravated so that it is once more imperative that legislation be enacted immediately to provide for cooperation with the federal government in its relief and recovery program; to allay the present widespread public discontent and social unrest by the provision of direct relief or work relief, or both, for the unemployed, needy and destitute citizens of this state; to provide a program of necessary public works in connection therewith; to prevent disaster in this critical emergency; to defend the state; and to meet other emergencies and requirements which have arisen since the adjournment of the regular and special sessions of the General Assembly. Two statutes passed at the first special session (S. L. pp. 60, 94) and the bill before us contain similar declarations. Those findings and declarations are entitled to great respect;

indeed, we have held that in some cases findings and declarations of fact by the governor, as well as by the General Assembly, are conclusive upon the courts.

Section 5 of article 4 of the Constitution empowers the governor to call out the militia to suppress insurrection, and section 218 of the Compiled Laws provides: "When * * * insurrection in the state is made or threatened the governor shall order the national guard to * * * suppress the same." In *In re Moyer,* 35 Colo. 159, 85 Pac. 190, it was contended that notwithstanding the governor's declaration that San Miguel county was in a state of insurrection, as a matter of fact such condition did not exist. We held that contention to be without merit, saying (p 164): "It must, therefore, become his [the governor's] duty to determine as a fact when conditions exist in a given locality which demand that in the discharge of his duties as chief executive of the state he shall employ the militia to suppress. This being true, the recitals in the proclamation to the effect that a state of insurrection existed in the county of San Miguel cannot be controverted. Otherwise the legality of the orders of the executive would not depend upon his judgment, but the judgment of another co-ordinate branch of the state government."

We have made a similar ruling with reference to legislative declarations. Section 1 of article 5 of the Constitution vests in the General Assembly the legislative power of the state, but reserves to the people the right to reject at the polls all legislative acts, with one exception noted below. This reserved power is called the referendum, and the referendum may be ordered, except as to laws "necessary for the immediate preservation of the public peace, health and safety * * *." We have held repeatedly that a legislative declaration in a statute that it is necessary for the immediate preservation of the public peace, health and safety is conclusive upon all departments of government and all parties, so far as it abridges the right to invoke the referendum. *In re Senate Reso-*

*lution,* 54 Colo. 262, 130 Pac. 333; *Van Kleeck v. Ramer,* 62 Colo. 4, 156 Pac. 1108; *In re Interrogatories of the Governor,* 66 Colo. 319, 181 Pac. 197.

In the Van Kleeck case, supra, we said (p. 10):

"By article III of our Constitution it is provided:

" 'The powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution *expressly* directed or permitted.'

"During the process of the enactment of a law the legislature is required to pass upon all questions of *necessity and expediency* connected therewith. The existence of such necessity is a question of fact, which the general assembly in the exercise of its legislative functions must determine; and under the constitutional provision, above quoted, that fact cannot be reviewed, called in question, nor be determined by the courts. It is a question of which the legislature alone is the judge, and when it determines the fact to exist, its action is final. The courts cannot be advised what facts the general assembly acted upon when it determined that a statute was *necessary for the purposes specified,* and to undertake to review its action upon a question of fact, would be a collateral attack upon its judgment. The general assembly has full power to pass laws for the purposes with respect to which the referendum cannot be ordered, *and when it decides by declaring in the body of an act that it is necessary for the immediate preservation of the public peace, health or safety, it exercises a constitutional power exclusively vested in it,* and hence, such declaration is conclusive upon the courts in so far as it abridges the right to invoke the referendum. * * * To conclude the contrary would violate the constitutional provision to which we have referred, the plain object of which is to inhibit one department of government exercising any power that

by the Constitution is vested in another. The Constitution defines the powers and duties of each department, and should the courts venture to substitute their judgment for that of the legislature 'in any case where the Constitution has vested the legislature with power over the subject, they would enter upon a field where it is impossible to set limits to their authority, and where their discretion alone, would measure the extent of their interference.'' (Italics after the first are mine.)

Such is the law even where the result is to deprive the qualified electors of the very important right to express their views at the polls. Perhaps the more reasonable rule to apply in the present proceeding is that such declarations are entitled to great respect, and, while not conclusive on the courts, will be regarded as highly persuasive and to be rejected only in case they are palpably false. *Milheim v. Moffat Tunnel Imp. District,* 72 Colo. 268, 211 Pac. 649. In *State v. Martin,* 173 Wash. 249, 23 P. (2d) 1, it was held that the legislative declaration of facts constituting emergency for legislation is conclusive, unless, giving effect to every favorable presumption, the declaration, on its face, is obviously false; and that in determining the truth or the falsity of such legislative declaration, the court cannot inquire as to the facts, but must consider the question from what appears on the face of the act, aided by its judicial knowledge.

From what appears on the face of the bill before us, aided by our judicial knowledge, are we justified in saying, as the majority do in effect, that the declarations of the Governor and the General Assembly are palpably or obviously false? I respectfully submit that the question should be answered in the negative. It is a matter of common notoriety, and of such matters we take judicial notice, that unparalleled conditions have confronted, not only the state, but the entire country; that millions of persons were thrown out of employment; that those receiving direct relief from public and private funds have been variously estimated to be somewhat between twenty

and thirty-five per cent of the entire population, that hunger, want, distress and destitution were widespread throughout the land; that in order to lessen the menace, the nation, the states, the various subdivisions of the states, and private charitable organizations have expended billions of dollars in direct relief, and have distributed vast quantities of food, clothing and fuel; and that in order to give employment, public improvement projects involving the expenditure of enormous sums of money were undertaken; that states and their various subdivisions, and railroads, banks and other business concerns applied for and received millions of dollars from the federal government as outright contributions or as loans to enable them to function and to save a general collapse. The measures adopted to meet the emergency are comparable in magnitude to those resorted to during the World War. The natural sequel to hunger and destitution is desperation, and those rendered desperate by such causes yield not infrequently to revolutionary propaganda. Government investigations show that those organizations and individuals who seek the overthrow of our government have been active throughout these distressing times. An ounce of prevention is worth a pound of cure. What would have happened if preventive measures in the way of relief on a vast scale had not been resorted to, and what would happen if such measures should be abandoned at this time, can only be conjectured. Recent tragic events abroad and the teachings of history warn us not to be too optimistic concerning the results likely to follow in such a case. There are no greater menaces to the state than widespread hunger, destitution and desperation. However, the measures to be adopted to meet such an emergency are legislative problems with which article 3 of the Constitution forbids us to meddle.

Conditions here were so desperate that the state was wholly unable to cope with them alone. At the request of the state officials, the federal government contributed

millions of dollars to relieve distress in this state, but with the distinct understanding that the General Assembly should pass relief measures to help care for the destitute here, and that if it failed to do so federal relief would be withheld. Such was the situation when the General Assembly met twice in special session and attempted to discharge the obligation resting upon the state, and thus prevent a discontinuance of the indispensable federal aid. The bill now before us represents the second attempt. For the first attempt, see *Walker v. Bedford,* 93 Colo. 400, 26 P. (2d) 1051.

The reason why great respect should be accorded to legislative findings and declarations is not only that they are made by a co-ordinate branch of the government, but that they are made by those whose duty it is to investigate and know the facts. Legislators reside in all parts of the state, and are in far better position to know the actual conditions throughout the state than are Supreme Court justices, closeted as they are, in the quiet, sheltered seclusion of their chambers.

After a careful consideration of the bill and of the facts of which we must take judicial notice, I am unable to join the majority in saying, in effect, that the findings and declarations of the Governor and the General Assembly are palpably and obviously false. That being so, it seems to me that the bill before us is a bill to defend the state within the meaning of the Constitution. Surely, if defense of the state is not confined to defense against armed aggression, and we have seen that it is not, the conditions found and declared by the Governor and the General Assembly presented a situation as menacing to the state as armed aggression would be, and called as imperatively for defensive measures.

It is not quite clear what is meant by the following language in the majority opinion: "Certainly the emergency arising from the unemployment of the comparatively small number of men to whom this proposed act would give work on the highways of the state does not

rise to the solemnity of such an attack or threat, and no facts are presented which lead to such a conclusion. Were it otherwise we cannot close our eyes to the natural conditions involving such employment. It is now almost January 1, and the very nature of the proposed work forbids that it could be in full swing, employing anything like its full complement of men, before spring. Months must elapse before the alleged defense can become reasonably effective. Meanwhile the present emergency, in its most serious aspect, must probably pass."

Of course, this bill is only one of the measures required to meet the emergency; others must follow. If the language quoted is intended to convey the idea that this bill is not a defensive measure because it cannot by itself afford all the relief that the occasion demands, it may be answered that although a war cannot be won with only one battleship, a bill authorizing the construction of a battleship would be none the less a defensive measure. If, however, the purpose is to question the wisdom, policy and expediency of the measure, the answer is that such matters are within the exclusive province of the legislative department, and that it is no less obligatory upon courts to observe the limitation set by the Constitution upon their powers than it is obligatory upon legislatures to observe the constitutional limitation upon legislative powers.

In conclusion, I respectfully submit:

1. That the bill does not contemplate the contracting of a debt within the meaning of section 3 of article 11 of the state Constitution.

2. That even on the theory of the majority that the bill does contemplate the contracting of such a debt, the bill comes within the exception provided for in that section, because the contracting of the debt would be for the defense of the state.

MR. JUSTICE HOLLAND concurs in this dissenting opinion.